ESE, J.
These cases have been argued together, and from their nature and character may properly be considered in immediate connection. I propose to consider, first, the action of trover in which the right of the inspector to appropriate to his own use, the flour drawn by him from the barrel in the process of inspection, called the ‘ ‘draft flour,” is the subject of controversy.
This right is sought to be sustained upon two grounds:
1. The long continued usage or custom of the inspectors of flour in this state to retain the draft flour as a part of the compensation for their services.
2. The recognition of this custom in acts of assembly and the sanction thus given to it by the legislature.
If there could he in Virginia, a legal, valid usage or custom the effect of which is to operate per se, as an exception to the general rules of the common law, and to vest a right which could not be claimed under them but must be claimed expressly against them, T should yet hold that such a custom when invoked for the benefit of a public functionary by transferring to him a portion of the goods of the citizen with which he is called upon to deal in the discharge of his office by way of additional compensation or perquisite, over and above what the law expressly provides, would be bad as being unreasonable, unjust and contrary to the policy of our laws. It would be unjust and unreasonable that a public officer having a specified duty to i>erfom in relation to the property of others, for a prescribed fee, should the discharge of that duty acquire a right not only to the fee allowed, *but also to a part of the property itself. It thus makes him the sole judge of the compensation which he shall receive. There is not even the pretense of a contract which might be said to be made with reference to the custom. The manufacturer who designs his flour for shipment has no choice in regard to the inspection. He is required by law to have such flour inspected, and is subject to a heavy penalty if he shall export or ship it without such inspection. He pays the fee because required by law to do so, but in no respect does he stand in the relation of a contracting party to the inspector. Now it is well settled that a custom to take or have any thing from another man’s land, or for a profit a prendre, is bad. Gateward’s Case, 6 Rep. 60; Grimstead v. Marlow, 4 T. R. 717; Blewett v. Tregonning, 30 Eng. C. L. R. 151; Wilson v. Willis, 7 East's R. 121; Race v. Ward, 82 Eng. C. L. R. 700; Waters v. Lilley, 4 Pick. R. 145; Perley v. Langley, 7 New Hamp. R. 233; Kenyon v. Nichols, 1 Rh. Isl. R. 106. In the case last cited, the claim was of a custom for all the citizens to take sea weed thrown up upon the shore, but it was considered to be a claim to have an interest or profit a prendre in the land of another, and as in the other cases, a custom to sustain such a claim was held bad. And no difference in principle is perceived between such a custom, and one to appropriate part of the personal chattels of another, against his will and without his consent, and without any consideration whatever. It is not an easement, or even a profit that is claimed, but a portion of the principal subject itself; and it seems where the claim is destructive of the subject matter it is held bad even if the party setting- up the custom does not claim to carry away and appropriate it ’ to his own use. Bland v. Lipscombe, 82 Eng. C. L. R. 712, n. It is but a petitio principii to say that the inspector may appropriate the draft flour to his own use because he *may destroy it or throw it away. If it be conceded that to “inspect” means more than to make mere ocular examination, and that the inspector is authorized to bake a portion of the flour into bread, or subject it to *884 a chemical test, still that would not authorize him to take away any more than is necessary for that purpose, nor even that for his own use and benefit. Taking' away the draft flour is no part of the inspection, for that may be made as well whether the inspector appropriates it to himself, or restores it to the owner.
The practice of millers to take toll for grinding gives no countenance to this custom. The cases are in no respect parallel. The shipper of flour has no option ; he must have his flour inspected and pay the fees without any thing in the nature of a contract between himself and the inspector. The owner of grain may or may not have it ground at his pleasure, and if he do it is matter of contract between himself and the miller that the toll is yielded. They may agree that the compensation for grinding shall be in money or other thing, instead. Nor is there any real force in the suggestion however plausible it may seem, that the inspector may keep the draft flour for the purpose of vindicating his judgment, if he should be sued for a false brand. It is impossible to believe that such a motive could have been the origin of this custom. No case, I apprehend, has ever occurred in which such an instrument of evidence has been resorted to, nor is it at all likely that ever the flour drawn from a barrel by an inspector was retained for any such purpose. In point of fact, the practice has been universal for the inspectors to mix the flour thus drawn in a common bulk and to sell or otherwise dispose of it. And moreover the gist of 'any action against an inspection for a false brand, would be the honest}’, and not the absolute correctness of the judgment which he had pronounced.
*This custom, as it seems to me, is ' also bad, because in conflict with the general policy of the law, and this in several respects. It is certainly a marked feature in our system of offices that the compensation of public functionaries shall be fixed and certain. It is a great and pervading principle of our Code and is essential to the purity and impartiality of the government. The idea of a “perquisite of office” in the sense of a fee or allowance for services beyond the ordinary salary or settled wages, has no place in our legislation but seems to be repudiated by the most necessary implication. Once to admit it is to open a wide door for imposition and corruption. Dr. Webster tells us that the common acceptation of the word in America is a fee to an officer for a specific service in lieu of an annual salary, but he gives also the other sense in which it is elsewhere used. The salaries fixed in our Code for some officers, the specified fees for services allowed to others and the penalties imposed in some instances for demanding fees for services not performed or for demanding greater fees for services than those allowed by law, all show the intention of the legislature that the compensation to the officer should be restricted to the fees expressly provided. In the inspection laws throughout, the fees are specifically named, and the idea of any further compensation would seem to be plainly excluded. For many years indeed prior to 1792, after the sum named were added the words “and no more” which served, not merely to limit the pecuniary fee to be paid down, but to exclude the idea of any other compensation, and thus discountenance the custom of taking the draft flour; and although in that year these words were dropped, it was doubtless because they were deemed surplusage the idea having been sufficiently expressed, as the words “to be paid down by the owner” found in previous acts had been dropped in 1787. And when the present Code fixes *the inspector’s fee at one cent the barrel, it can hardly mean to give as much more in. the form of flour as the inspector may think it necessary to take for the purpose of inspection. Now although a custom when otherwise good may override and displace the common law rule, yet a statute introducing a new principle, with a negative either express or necessarily implied, must be strictly pursued and no custom can be set up against it. Dwarris on Stat. 475, 477; Lord Lovelace’s Case, Wm. Jon. 270; Jones v. Smith, 2 Bulstr. R. 36; King v. Bishop of London, Show. R. 413, 420 ; 9 Bac. Ab. “Statute,” G, p. 237. Sedgwick on Stat. and Constit. Law 38, 39. And such is I think the character of these inspection laws; for a negative to any other compensation than the fee expressly given arises from most necessary implication. And although a custom or usage may be invoked to interpret a statute or a contract that needs interpretation, where something is to be done not sufficiently explained, yet where there is no doubt or ambiguity, it cannot be resorted to to contradict what is plain or to control, vary or add to or diminish what is expressed in formal and deliberate terms. 1 Greenleaf Ev. § 292, § 293, and cases cited in nn. Blackett v. Royal Exch. Ass. Co., 2 Cromp. & Jer. 244; The Schooner Reeside, 2 Sumn. R. 567, opinion of Story, J.
This custom, also as it seems to me necessarily contravenes the policy of the provision forbidding an inspector to trade in any commodity of which he is inspector. For when it is considered that this inspector withdrew for his own benefit very nearly sixty thousand pounds of flour on the inspections for one house within a period of seventeen months, and that for the year ending the 30th of June 1858 the number of barrels inspected was six hundred and fifteen thousand two hundred and twenty-nine, and that for two quarters only ending December 31, 1858, the number was *four hundred and one thousand seven hundred and thirty-eight, it must be perceived that the inspector becomes of necessity a large dealer in the commodity of flour. It is true the section authorizes the inspector to sell any commodity which he may have received in payment of his fees; but by this doubtless is meant any article *885 for which he agrees that the fee allowed him by law may be commuted. I cannot think that the act contemplated any thing in the nature of a perquisite to be received in kind by the inspector over and above the fee prescribed. I think it a sound principle of construction that a law imposing burdens, like any act granting privileges in derogation of common right, should be interpreted favorably to the public, and if there be even reasonable doubt as to the extent to which it goes, such doubt should be resolved in their favor. If a definite and described charge be made, there can be no room to presume that some other and further burden in respect of the same subject was intended to be imposed.
But I think this custom is also bad because it lacks the necessary age to render it valid as such. Indeed I do not see how any particular custom in derogation of the common law and which prevents the application of the common law rule to the locality in which the custom prevails by showing that the common law as to this subject never had any existence in that locality can be held good in Virginia. In Harris v. Carson, 7 Leigh 632, Judge Cabell in his opinion, in which all the other judges concurred excepting Brooke who was absent, says “a custom to be valid must be as old as the common law; it imist be immemorial. And if the particular custom be proved to be immemorial, it necessarily excludes the general custom or common law; for two opposite and inconsistent customs cannot have imrnemorially existed in the same place and as to the same thing.” In that case the question was as to the *right of the outgoing tenant by a lease under seal, for a fixed and determinate period, to take the waygoing crop. And although in Wigglesworth v. Dallison, Doug. R. 201, it was decided that a custom would entitle such tenant to the waygoing crop even where the lease was by writing under seal and to end at a fixed time, yet it was held that in Virginia the tenant could assert no such claim as no such custom could be good because not immemorial. And-the judge said: “It is clear that it could not have existed at any time even as a recent custom until after the settlement of the country and after the common law had attached to every part of it. And nobody will contend that a recent usage or practice however general will change the common law.”
'This opinion concurred in by ail four judges of this court who were present, would seem to be conclusive upon the question in this case. Nor do I feel at all prepared to advance a different one. That a custom to displace the common law must be immemorial, and that the time of memory runs back to the reign of Richard Coeur de Dion, are maxims of such ancient, universal and familiar acceptation in the English law, that it is now quite too late to controvert their correctness. And although this period was that fixed for the limitation of the writ of right by the statute of Westminster First, which was afterwards reduced to sixty years by the statute of 32 Hen. VIII. ch. 2, I am aware of no change made in the mode oí estimating the period during which to be good a custom must be said to have continued. It is true that it has been made the subject of regret and complaint that the time of legal memory was not shortened by the courts of law upon the same reason which led to the reduction of the period of limitation, yet that it remained unchanged is every where conceded. See Best on Presumptions 187;
Cruise’s Dig. title XXXI. ch. *1; 2 Greenleaf Ev. $ 538; Coolidge v. Larned, 8 Pick. 504. I am aware that cases are to be found in which regular usage short of the prescribed period has been held to be sufficient evidence of the custom alleged, and where uncontradicted or unexplained, deemed sufficient to authorize a jury to find the existence of an immemorial custom. But they do not contradict the general rule as they will be found to depend upon the artificial doctrine of presumptions, which has been introduced, in part, or at least taken advantage of, to evade the rule of legal memory and remedy the inconvenience attributed to the omission of the courts to shorten the period by analogy to the reduction of that of the limitation of the writ of right. But this doctrine cannot be applied to a subject like this. It may not be confined to incorporeal hereditaments but may extend to real estate also; but this falls within neither description : and the presumption of a grant is not a rule of law but is to be the basis of a finding as to a fact by a jury. Moreover, it can only be made where the thing lies in grant and where there is a party by whom the grant could be made as well as one to receive it. Such a right as this could not be the subject of a grant, nor is there any one who could be supposed to have made it, nor any one who could be supposed to have accepted it. The millers of the present day cannot be bound by the concessions of those of former years because in no legal sense can the latter occupy the relation of ancestors or predecessors to them, nor can the inspector of this day claim to have derived any such right by succession. His rights grow out of the statute and not of any relation in which he can be supposed to stand to those who may have happened to precede him in the office.
In reference to those cases in which a jury has been advised to presume a usage to have been immemorial from proof of its continuance for a shorter period than *lhat of legal memory, it must be observed that this was where the usage was uncontradicted and unexplained and its origin not shown to have been within the prescribed period. This however may always be done and the presumption that the custom was immemorial thus repelled. Nor is it necessary that its origin or a time when it did not exist must be shown by the memory of some living witness: for the “memory of man” which is *886 spoken of is not to be understood as merely living- memory, but memory by the means of records or other written memorials. And therefore where there is any proof of the original or commencement of any thing, it cannot be claimed by prescription unless it were before the commencement of the reign of Richard I. Coke Litt. 113; Ibid. 115 a ; 3 Stark. Ev. 1204; Bull. Nisi Pr. 248. The origin of the usage in this case, though not in the memory of living men, is shown by the dates of the acts establishing inspections beyond the earliest of which of course the usage could not have existed.
I have not thought it necessary to enter into the enquiry as to the origin of the custom of merchants, or into those respecting the origin of the jurisdiction of the Court of chancery or of the King’s bench in other than criminal cases, or of the Courts of exchequer and common pleas; nor shall I stop to consider the custom to bar entails b}' surrender in the Bords’ court without a recovery; all of which subjects have been so earnestly discussed by the counsel. Time and space would fail me were I to undertake to enter upon the task. I must content myself with saying that I think these enquiries would not shed much light upon the subject of discussion here, depending, as I think it does, upon a few intelligible legal principles. Neither can I stop to examine the various cases cited from the reports of our sister states and some of the courts of the United States to establish a doctrine different from that of our *own court. It is sufficient for my purpose that this court has by the unanimous opinion of all the four judges sitting, disaffirmed the existence of any customary law in Virginia in a case in which the alleged custom would have been and in fact had been held good in England, and that upon general principles I think that conclusion sound and correct. Counsel, it is true, have sought to distinguish the custom alleged in this case from that claimed in Harris v. Carson, as being a general custom prevailing throughout the state, whilst that in the latter case was a mere local custom prevailing in a limited section of the state. It would be difficult to predicate of a custom prevailing at the few points at which there have been inspections of flour that it was general and prevailed throughout the state: but whether general or local, I think the objections to it are equally fatal. The cases cited will I think for the most part be found to rest upon the doctrine of presumptions to which I have already adverted, or to fall within that class in which the custom has been held to be effectual not per se as such, but because it was supposed to enter into and form part of the contract between the parties, thq."same being assumed to have been made with reference to it. This class of cases I do not undertake to limit or call in question. I think we have nothing to do with them here. As I have endeavored to show, there is no semblance of a contract between the shipper and the inspector, nor, as I think, is there any between the legislature or the public and a party appointed to exercise a public office. He takes the office on the terms and conditions prescribed by the statute, and when it allows a fixed and definite fee for the service which he is to perform, I think it very far-fetched and illogical to say that he acquires also by virtue of his appointment, a right as by contract, to a portion of the property of the citizen in respect of which his ^office is to be exercised because his predecessors in the office may have been in the habit of taking a like portion without objection or protest on the part of those with whose property they had been called upon to deal. The only contract which as it seems to me can possibly be inferred from an appointment to a public office created by statute, with specified fees for the services rendered, and its acceptance, is an agreement on his part to perform the duties of the office, • and on the part of the public that he shall be entitled to the fees prescribed by the act when the services shall have been rendered.
In every view which I have been able to take of this case, -I have been brought to the conclusion that there is and can be, no such customary law as that contended for, which per se can serve to vest the right claimed by the inspector. Nor can I think that it is any infringement of the right of the people to deny the existence of such customary law unless recognized by the legislature, as contended by the counsel. On the contrary at this day and in this age, in a government like ours, there can be little need of a resort to such a source as custom for legal sanction. Andas the constitution vests the whole law-making power in the legislature it is difficult to see how comparatively a few individuals can make a law bj' custom which shall be binding upon the public at large. It would savor more of encroachment upon the rights of the people to say that they should be bound by a law which had never been assented to by them through their proper representatives. And if the legislature were to declare by express enactment that custom might make law, it might well be questioned whether such a provision would not be void for the want of power in the legislature to delegate to a few men authority to make a law by getting up a custom.
But it is contended that if the custom alleged cannot ^operate proprio vigore to vest the right claimed in the inspector, yet that it has been sufficiently recognized by statute and thus has received the legislative sanction. Certainty if it has been recognized either expressly or by necessary implication it would thereby receive vitality, and the right claimed could well be asserted as conferred by the statute. Now I have examined all the acts of the general assembly concerning the inspection of flour commencing with the act of Eeb-ruar3r 1745 and coming down to the chapter upon that subject in the present Code, and I have been unable to find any provision in *887 which the right of the inspector to appropriate the draft flour to his own use is in any way recognized. The draft flour is no where mentioned in any of the various acts that have been passed from time to time, nor have I been able to find a single provision for which the right of the inspector to take it can be derived by necessary or even fair implication. It has been argued, it is true, upon the construction of the act in the present Code upon this subject, that as it had been the usage of the inspectors to take the draft flour under the previous acts, that usage should be regarded ns the contemporaneous construction of those acts; and that as the legislature had substantially re-enacted those laws without negativing the usage, it had adopted that construction with the acts themselves. I do not at all impugn the maxim “cotemporanea expositio optima et fortissima est in lege,” but I think it has no application here. The usage was no construction of the acts, but was something in direct contravention of their provisions. It was in terms negatived up to the act of 1792 by the addition of the words “and no more” after the fees prescribed ; and although those words were dropped in that act, yet the negative was as strongly implied by its terms. That act was entitled “an act reducing into one the several acts for regulating the inspection i;'of flour and bread,” and was special and precise in its provisions, and it is most reasonable to infer that the words were dropped because it was thought that naming a specific fee for the service was a sufficient exclusion of the idea of any thing more being demanded, and that the words were therefore unnecessary. If it had been intended to sanction the usage some allusion would doubtless have been made to it. There might be some little plausibility in the argument if it appeared that the act of 1792 had passed after the reports of the committees to the house ascertaining the fact of such usage, which have been referred to (supposing these reports could be received in aid of the construction of the acts as to which I express no opinion) ; but the reports which have been cited in the argument appear to have commenced in 1831 and none has been shown prior to 3792. Nor is there a single provision in the act of 1819 or that in tlie present Code, which can, as it seems to me, with the least plausibility, be referred to the knowledge on the part of the legislature of the existence of this usage. The reduction of the fee at Richmond from two cents to one cent has been relied on, but that should more naturally be referred to the great increase in the quantity of flour inspected at Richmond than to the usage of the inspector to take the draft flour. The legislature no doubt thought from the large number of barrels usually inspected at that point, the statute fee would afford an ample salary to the inspector, without any reference to the draft flour. No reduction was made in the fee at any other place, although the usage appears to have prevailed at all the places at which there were inspections, and although the existence of the usage was as well known as far back as 1831, at least, as it was in 1849, yet during all that period no change had been made that "'can be traced directly or indirectly, to the existence of this custom.
Upon a review therefore of all the inspection laws, and finding no mention made any where of the draft flour nor any provision which either by necessary implication or even fair intendment can be held to recognize the usage to take it, I think the fair and reasonable inference is that the legislature did not intend either to affirm or disaffirm the right of the inspector to appropriate it to his own use, but did intend to leave the question exactly'’ where it then stood until the right should be denied and the subject contested before the courts. Whilst however we may look in vain to the acts for the explanation of this usage, I think it not difficult to understand its true origin. At first and for a long time the inspections of flour were in small parcels, and the flour drawn was too inconsiderable to attract the attention of the owner or the inspector. In course of time however, it became worth the attention of the inspector whilst the quantity taken from any one owner was not sufficient to induce him to make any objection. It gradually continued to increase until as it appears in one year alone, the quantity of the draft flour received by the inspector and appropriated to his own use must have amounted to upwards of fifteen hundred barrels; and when the large manufacturers of the article began to realize the large quantities of flour which they were thus made to contribute 1o the store of the inspector, their attention was drawn more closely to the subject, and hence their protests against the right to take it under this litigation.
Being thus of opinion that there is nothing in the statute which confers or recognizes the right of the inspector to take the draft flour, I deem it entirely timieccss;; ry to examine the question discussed by the '"'counsel whether it would be within the constitutional competency'’ of the legislature to take from the citizen a portion of his property for the benefit of the inspector without making the former any pecuniary compensation, and forbear to express any ox>inion upon it.
The complaint of the exclusion of the testimony of the witness Stovall admits I think of several answers. In the first place the issue was one of fact before the jury and it certainly' could not be material for their purposes that they should be informed as to the state of knowledge of the legislature or of members in respect of the existence of the custom of the inspectors to take the draft flour, at the time the inspection law was passed. The object, it is claimed, was to aid in the construction of the act, and if admissible at all, it was not as evidence to go to the jury, but as matter for the enlightenment of the court. Again: as we have seen, there was no mention of *888 the draft flour in the act, and nothing' in its provisions which could be traced to such knowledge as its fruit, the evidence was simply irrelevant for any purpose. But, thirdly, I go further and maintain that the evidence was illegal in itself and inadmissible even for the consideration of the court. Without attempting to define the limits within which a court in construing a statute may properly look to extrinsic matters for the purpose of ascertaining the intention of the legislature, I cannot hesitate to say that to call witnesses to the stand for the purpose of proving that facts were known to the legislature or members thereof which may be supposed to indicate their intention in passing the law, must be inadmissible. As has been remarked, if the utmost latitude of proof was allowed, if reports and journals and parol evidence of witnesses and even of the members themselves, were admitted, it would be utterly impossible in the great majority of cases to prove what the intent *of the legislative body actually was; and all attempts by any kind of evidence to get at a meaning different from that embodied in the enactment would from the nature of things prove utterly vain and illusory. Sedgwick on Stat. and Constit. Law, p. 332. See also Ibid, p. 240, et seq. ;Bank of Pennsylvania v. Commonwealth, 17 Penn. State R. 144; Southwark Bank v. Commonwealth, 26 Penn. State R. 446; Supervisors of Niagara v. The People, 7 Hill N. Y. R. 504; Sedgwick Stat. & Const. Law 243. Where witnesses are called to prove knowledge on the part of members of particular facts, they can perhaps only speak from the recollections of conversations with them, and thus in the grave matter of expounding a statute, a species of evidence is resorted to which upon an issue of fact is regarded as not entitled to much consideration because so liable to be misunderstood or perverted. The evils that might result from such a mode of interpreting a statute may be curiously illustrated thus: in several cases in different circuits involving the construction of the same act different members might be called as witnesses whose recollections might differ materially as to the facts supposed to be known to the legislative body, and if the, construction is made to depend upon their testimony, it would be different in different cases, and yet each case might be right upon its record and contradictory judgments upon the same statute would have to be affirmed. I think the tendency of the modern decisions is to the rule that the meaning and intent of the lawmaker is to be sought for in the statute itself. See Bank of Pennsylvania v. Commonwealth, above cited, in which it was held that evidence of public embarrassment, the proclamation and message of the governor, the journals of the house of representatives, and the reports of committees should be wholly disregarded. In Southwark Bank v. Commonwealth, it was declared that the journals are not evidence of the ^'meaning of a statute, because this is to be ascertained from the language of the act itself and the facts connected with the subject on which it is to operate. And per Bord Denman, C. J., 1 !in construing an act of parliament we cannot go into what was said in either house of parliament before the act was passed.” Regina v. Whittaker, &c., 61 Eng. C. L. R. 635. See also Schooner Paulina’s Cargo v. United States, 7 Cranch’s R. 52, 60; The King v. Poor Law Commissioners, 6 Adolph. & Ell. 1, 7; King v. Burrell, 12 Adolph. & E11. 468. I am not aware that it has ever been settled in this state whether extrinsic facts existing prior to the passage of a law, not being themselves rules of law or acts of legislation, can be taken into consideration in any way for the purpose of ascertaining the intention of the legislature, but I am clear that the mode of proof offered in this case was wholly' inadmissible.
The only remaining question in this case is that raised by the exception to the action of the court in arresting the counsel and prohibiting him from arguing before the jury against the instruction of the court. It is a duty which the court owes to its own self-respect as well as to the speedy administration of justice not to allow counsel to discuss before the jury the same matter which had been already decided by it. If the decision was right the party' could sustain no injury by not being allowed to controvert it before the jury. If it was erroneous, his remedy was by bill of exceptions and an application to an appellate court to correct the error. The wrong and injustice of any other rule will be apparent on a moment’s consideration. If th,e court has erred, the party aggrieved may have the error corrected how often soever it may be repeated. If the court was right, but the party has succeeded in getting a verdict in defiance of the court’s instruction, the party aggrieved has no remedy save *by an appeal to the same court to set aside the verdict and grant a new trial on payment of costs; and the power of the court to administer this remedy is exhausted after the second trial, so that if upon the third the party shall succeed in obtaining another similar verdict notwithstanding the instruction of the court, the party injured is totally without remedy.
Whatever therefore may be the true interpretation of the maxim that “the jury are the judges both of law and fact” as applied to criminal trials, I take it that in civil cases, it is for the court to expound the law and for the jury to pass upon the facts; and where the court has instructed the jury as to the law, it is no more competent for the jury to encroach upon the province of the court by finding a verdict in defiance of its instruction than it is for the latter to trench upon the province of the former by-undertaking to direct them as to the facts, and that no counsel should be permitted to argue against the instruction of the court for the purpose of inducing the jury to find a verdict in defiance of it. Smith v. Mor *889 rison, 3 A. K. Marsh. R. 81. See Garth’s Case, 3 Leigh 778, in which this is admitted by the counsel, Mr. B. W. Leigh to be correct.
I pass over the motion for a new trial as it involves no other question than those I have already considered, and proceed to the mandamus case which I shall endeavor to examine as briefly as may be.
The questions presented are whether the inspector of flour is authorized to exercise his office in any other manner than by boring through the head of the barrel; and if not whether he is restricted to an auger not exceeding half an inch in diameter.
The first act providing for the inspection of flour intended for exportation was an act passed in February 1745 which required the inspector to “view and examine” the flour in bulk, and if found clean, pure and -unmixed, to see the same packed in casks and barrels and stamped as therein directed, for which he was allowed a fee of six pence for every barrel of two hundred and twenty pounds or less, and for every cask of greater weight, eight pence. By the act of October 1748, the fee was reduced to three pence for such barrels and six pence for casks of greater weight. By the act of November 1762, the same fees were provided as in the last named act. By the act of October 1765, the mode of inspecting by boring the cask was first provided and the same fees were continued: but nothing was said in the act about the size of the auger. By the act of October 1776 the fee was reduced to one penny half penny per barrel of two hundred and twenty pounds, and in proportion for casks of greater weight, but nothing is said in Ihe act about the mode of inspection. This act expired by its own limitation and was revised and amended by the act of May 1780 which fixed the fee for the inspection of flour at five shillings per barrel of the then standard weight and in proportion for casks of greater weight. The next act on the subject was the act of May 1782 by which the quantity of flour which each barrel intended for exportation was required to contain was fixed at one hundred and ninety-six pounds. In November 1787, another act was passed entitled “an act to regulate the inspection of flour and bread,” which after reciting that the laws theretofore made for the inspection of flour had been found defective and further regulations had become necessary, proceeded to designate the different places at which inspections should be had and to prescribe various regulations concerning them. The mode of inspection was to be by boring through the head of the barrel with an instrument not exceeding ha1f an inch in diameter and the fee was fixed at two pence the barrel. This act was followed bjr that of December 1792 entitled 1 ‘an act for reducing .into one the several *acts for regulating the inspection of flour and bread.” This act prescribed general regulations upon the whole subject, and like the previous act directed the inspection to be made by boring through the head of the cask with an instrument not exceeding half an inch in diameter and fixed the fee at several places of which Richmond was one, at two cents. After the date of this act, I do not find that any thing is said in any act about the mode of inspection or the fee until the revisal of 1819 which prescribes the same mode of inspection and the same fee (at Richmond) as the act of 1792: nor after the revisal of 1819 do I find any change made until the revisal of 1849. Of the Code then adopted the eighty-eiglith chapter purports to be concerning the inspection of flour and certain other commodities in the number of which are fish, salt, butter, lard, lime, &c. ; and the twentieth section provides that the inspector shall attend when requested and inspect any commodity of which he is inspector, by bori-ng through the head in case of a barrel, with an auger not exceeding half an inch in diameter or in some other satisfactory manner as to barrels and all other parcels. Now I think upon a review of all these laws, that it was not the intention of the legislature to change the mode of inspecting flour. Since 1765 the mode of inspection had been by boring with an auger (excepting, perhaps, during the period between 1776 and 1787) nor do I see any sufficient indication of a purpose to change that mode at the revisal of 1849. By the eighth section all barrels containing flour, meal and bread offered for inspection are required to be well nailed with four nails in each chine hoop and three nails in each bilge hoop, and by the thirty-ninth section authority is given to the inspector to unpack any barrel but only in case he shall suspect false marking or the purchaser shall request it. These provisions would seem to exclude the idea of unpacking *for the ordinary purpose of inspection and although the provision as to nailing was extended to bread which could scarcely be inspected by boring through the barrel, it was probably done throug-h inadvertence. The revisors for the sake of brevity, have sought to embrace a great many different commodities in one chapter and have therefore necessarily used language of a somewhat general character, but I think it should be construed reddendo singula, singulis, and in the absence of any manifestation of any purpose to change the long established and familiar mode of inspecting flour, I should construe the section to mean that as to flour and corn meal the inspection should be by boring through the head of the barrel; and as to other commodities, the inspection of which could not be conveniently or satisfactorily made in that way, in some other satisfactory manner. If this had been intended to apply to flour also, there would have been no need to say anything of boring at all, and what was said of it, should for the sake of brevity, so much desired, have been omitted. Looking therefore to all the previous legislation (clearly a legitimate mode of arriving at the true construction of any act), I am of opinion that *890 it was intended that such commodities as had been previously inspected by boring through the head of the barrel should continue to be inspected in the same way, and that it was not intended in respect to the very important subject of flour to leave the mode of inspection in the discretion of the inspector: that in respect to flour boring was considered a satisfactory mode of inspection, but in respect to other commodities to which that mode of inspection was unsuited, the inspector was to adopt some other that would furnish a satisfactory test.
As to the size of the auger which the inspector of flour is permitted to use, I think there can be no real question. It is true that the inspector avers in his return *to the writ that he cannot made a satisfactory inspection by boring with an auger of no greater diameter than half an inch, and that it had always been the custom of the inspectors to bore with an auger of greater diameter, such as he had been in the habit of using. But the averment that the inspection could not be made in a satisfactory manner with a half inch auger was one which, I think, it was not competent for the inspector to make. The law had ascertained that a satisfactory inspection could be made with such an instrument and it was not for him to gainsay it. And it is in vain to appeal to custom to justify so plain a deviation from the requirement of the statute.
Much of what has been said upon the other branch of this case, will apply on this point to this, and I shall not therefore repeat it. I will content myself with saying that in my judgment this statute needs and will admit of no resort to a usage or custom for its interpretation. To adopt it would be not to construe the law but to set up something in direct contravention of its provisions. The restriction upon the size of the auger was most probably intended to limit the loss that might unavoidably occur in the process of inspection through injur}' to the surrounding mass by the admission of air and weakening the head of the barrel, and parties are as much entitled to have it respected as any other requirement of the act; and if the inspector will persist in disregarding it, any party agg-rieved is clearly entitled to the mandamus to enforce it.
Thus as it seems to me there is no error in either judgment, and I am of opinion that both should be affirmed.
The other judges concurred in the opinion of Bee, J.
Judgments affirmed.