Filed March 13, 1890.

No. 15,350.

The State, ex rel. Clark, *v.* Haworth, School Trustee of Monroe School Township, Howard County.

Constitutional Law.—*Schools and School Affairs.—Exclusive Power of Legislature Over.—Local Self-Government.*—The control of schools and school affairs is vested in the law making power of the State, upon the principle that schools are intrinsically matters of State concern, and not of a local nature. Both by the Constitution and the intrinsic nature of the duty and the power, the authority is exclusively legislative, and the matter over which it is to be exercised solely of State concern.

Same.—*Legislative Power not Exhausted by Exercise.—Legislative Discretion.—Change of Plans.*—The power over schools being a legislative one, is not exhausted by exercise. The Legislature having tried one plan is not precluded from trying another. It has a choice of methods, and may change its plans as often as it deems necessary or expedient, and for mistakes or abuses it is answerable to the people, but not to the courts.

Same.—*Public Schools.—Statutory Authority Over.*—It has been the uniform course, since the organization of the State, to regulate and control school affairs by legislation. All the public schools have been established under legislative enactments, and all rules and regulations have been made pursuant to statutory authority. Every school that has been established owes its existence to legislation; and every school officer owes his authority to the statute.

Same.—*Uniform System of Common Schools.—Constitutional Provision Concerning.*—The Constitution expressly enjoins upon the General Assembly

The State, *ex rel.* Clark, *v.* Haworth, School Trustee, Etc.

the duty " to provide, by law, for a general and uniform system of common schools," and the power is granted to enable the General Assembly to effectively perform the duty. It is impossible to conceive of the existence of a uniform system of common schools, without power lodged somewhere, to make it uniform, and even in the absence of express constitutional provisions that power must necessarily reside in the Legislature.

SAME.—*Course of Study.*—*System of Instruction.*—*Authority of General Assembly as to.*—If the power does reside in the General Assembly, then it must have, as an incident of the principal power, the authority to prescribe the course of study and the system of instruction that shall be pursued and adopted, as well as the books which shall be used.

SAME.—*Monopolies.*—*Act of March 2d, 1889, does not Create.*—The act of March 2d, 1889 (Acts 1889, p. 74), is not within the constitutional provisions directed against monopolies. There is no exclusion of bidders, no limitation of the right to furnish school books to the people of the State to any class; on the contrary, all who are prepared to supply such books as the statute makes the standard are invited to compete for the contract. No special privilege is granted to any one, no right denied to any one, for all are invited to enter the field as competitors.

SAME.—*Procuring and Supplying of Books.*—*What Legislature May Prescribe.*—The Legislature has the power to require a designated series of books to be used in the schools, and to require that the books selected shall be obtained by the school officers from the person to whom the contract for supplying them may be awarded. It may not only prescribe regulations for using the books designated, but it may, also, declare how the books shall be obtained and distributed.

SAME.—*Legislative Discretion.*—*Courts can not Control.*—Where the power exercised is a legislative one, it is indisputably true that the courts can not control the legislative discretion.

SAME.—*Exercise of Legislative Right.*—*Privileges Conferred.*—If the right of regulation and control exists, then the fact that the exercise of the right does exclude some publisher is an inseparable and unavoidable condition of the exercise of the right. Without it the right is annihilated. If a clear and legislative right can not be exercised without conferring privileges in the nature of a monopoly, then a monopoly may be created, for a denial of the right will not be suffered.

SAME.—*Public Officer.*—*Duty of.*—*How May be Deduced.*—It is not necessary that a statute should in direct terms declare the duty of an officer, in order to make it an imperative one. The duty may be deduced from the general provisions and scope of the statute, regard being had to the evil intended to be remedied, and the object sought to be accomplished.

SAME.—*Act of March 2d, 1889.*—*Duties of Township Trustees Under.*—Under the act of March 2d, 1889 (Acts 1889, p. 74), the township trustees in this State are required to procure the books for which the State board

contracts. They can not determine whether they will, or will not, pro-
cure the books. To give effect to the intention of the Legislature, and
to secure the accomplishment of the principal object of the statute, it
must be held that its provisions create a legal duty which the trustees
can not put on or off at pleasure. It is manifest that to so construe the
statute as to enable township trustees to refuse to make reports, or to
prepare certificates, or to procure books, would defeat the leading pur-
pose of the legislature.

SAME.—*School Officers.—Legislature May Prescribe Duties of.*—The power over
the school system is legislative and exclusive, and the Legislature has
authority to impose upon all officers whose tenure is legislative, such
duties respecting school affairs, as it deems proper. All such officers
take their offices *cum onere*, and must do what the Legislature commands
or else resign.

BERKSHIRE, J., dissents.

From the Howard Circuit Court.

L. T. *Michener*, Attorney General, *J. H. Gillett, J. Morris,
J. M. Barrett, M. Garrigus, J. O. Moore, J. C. Blacklidge,
W. E. Blacklidge, B. C. Moon, J. S. Duncan, C. W. Smith, S.
Claypool* and *W. A. Ketcham*, for appellant.

J. *O'Brien, C. C. Shirley, A. C. Harris* and *W. P. Fish-
back*, for appellee.

ELLIOTT, J.—The questions presented and argued in this
case do not require us to do more than outline the pleadings,
for the questions are general ones involving the validity and
construction of a statute. It is sufficient to bring the ques-
tions clearly enough before the mind for investigation and
consideration to say, that the relator petitioned for a writ of
mandate to compel the appellee, as school trustee of Monroe
township, in the county of Howard, to certify to the county
superintendent of schools the number of text-books required
by the children of the township for use in the public schools,
and to procure and furnish such books as the law requires;
and that the return of the appellee to the alternative writ is
so framed as to present the question of the constitutionality
of the act of March 2d, 1889, and, also, the question as to
the duties of the school trustee under that act. Elliott's
Supp., section 1289; Acts of 1889, p. 74.

The act assailed does not impinge in the slightest degree upon the right of local self-government. The right of local self-government is an inherent, and not a derivative one. Individualized, it is the right which a man possesses in virtue of his character as a freeman. It is not bestowed by legislatures, nor derived from statutes. But the courts which have carried to its utmost extent the doctrine of local self-government have never so much as intimated, that it exists as to a matter over which the Constitution has given the law-making power supreme control, nor have they gone beyond the line which separates matters of purely local concern from those of State control. Essentially and intrinsically the schools in which are educated and trained the children who are to become the rulers of the commonwealth are matters of State, and not of local jurisdiction. In such matters, the State is a unit, and the Legislature the source of power. The authority over schools and school affairs is not necessarily a distributive one to be exercised by local instrumentalities; but, on the contrary, it is a central power residing in the Legislature of the State. It is for the law-making power to determine whether the authority shall be exercised by a State board of education, or distributed to county, township, or city organizations throughout the State. With that determination the judiciary can no more rightfully interfere, than can the Legislature with a decree or judgment pronounced by a judicial tribunal. The decision is as conclusive and inviolable in the one case as in the other, and an interference with the legislative judgment would be a breach of the Constitution which no principle would justify, nor any precedent excuse. But we need not rest our conclusion that the control of schools and school affairs is vested in the law-making power of the State, upon the proposition that schools are intrinsically matters of State concern, and not of a local nature—although it may there be securely rested—for our Constitution, in language that can

The State, ex rel. Clark, v. Haworth, School Trustee, Etc.

not be mistaken, declares that it is a matter of the State and not of the locality. The language of the Constitution is this : " Knowledge and learning, generally diffused throughout a community, being essential to the preservation of a free government, it shall be the duty of the General Assembly to encourage by all suitable means, moral, intellectual, scientific, and agricultural improvement, and to provide, by law, for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all." Article VIII, section 1. The Constitution enjoins a duty and confers a power. The duty and the power are co-extensive, but the object they are designed to accomplish is unified, because the duty is to " provide, by law, for a general and a uniform system of common schools," and the power is granted to enable the General Assembly to effect-ively perform the duty. Both by the Constitution and by the intrinsic nature of the duty and the power, the authority is exclusively legislative, and the matter over which it is to be exercised solely of State concern. That this conclusion is sound, is so clear, that authorities are not required to for-tify or support it, but authorities are not wanting, for the current of judicial decisions is unbroken. State, ex rel., v. School Directors, etc., 74 Mo. 21 ; State, ex rel., v. Board, etc., 35 Ohio St. 368 ; School Commissioners, etc., v. State Board, etc., 26 Md. 505 ; Robinson v. Howard, 84 N. C. 151 ; Stuart v. School District, No. 1, etc., 30 Mich. 69 ; Ford v. Kendall Borough School District, 121 Pa. St. 543 ; People, ex rel., v. Board, etc., 101 Ill. 308 ; Richards v. Raymond, 92 Ill. 612 (34 Am. R. 151) ; Powell v. Board, etc., 97 Ill. 375 ; Briggs v. Johnson County, 4 Dill. 148 ; Rawson v. Spencer, 113 Mass. 40 ; Commonwealth v. Hartman, 17 Pa. St. 118. Judge COOLEY has examined the question with care, and discussed it with ability, and he declares that the Legislature has plenary power over the subject of the public schools. He says, in the course of his discussion, that : " To what degree the Legislature shall provide for the

education of the people at the cost of the State or of its municipalities, is a question which, except as regulated by the Constitution, addresses itself to the legislative judgment exclusively." Again, he says : " The governing school boards derive all their authority from the statute, and can exercise no powers except those expressly granted and those which result by necessary implication from the grant." Const. Lim. (5th ed.) 225, note 1. No case has been cited by counsel, and none has been discovered by us, although we have searched the reports with care, which denies the doctrine that the regulation of the public schools is a State matter exclusively within the domain of the Legislature.

If it be true that the power is a legislative one, then it is indisputably true, that the courts can not control the legislative discretion. This principle is elementary in constitutional law, and it needs no support from precedents or decisions ; but the principle has been so well expressed by Mr. Justice BRADLEY that we quote his language. Replying to an argument that the mode in which the power was exercised was improper, this great judge said : " The answer is, the legislative department, being the nation itself, speaking by its representatives, has a choice of methods, and is the master of its own discretion." *Legal Tender Cases,* 12 Wall. 457 (561). We have adopted and applied this rule, and, indeed, we could not depart from it, without a disregard of principle, that no decision or precedent would excuse. *Hancock* v. *Yaden,* 121 Ind. 366.

As the power over schools is a legislative one, it is not exhausted by exercise. The Legislature having tried one plan is not precluded from trying another. It has a choice of methods, and may change its plans as often as it deems necessary or expedient ; and for mistakes or abuses it is answerable to the people, but not to the courts. It is clear, therefore, that even if it were true, that the Legislature had uniformly entrusted the management of school affairs to local organizations, it would not authorize the conclusion, that

it might not change the system. To deny the power to change, is to affirm that progress is impossible, and that we must move forever "in the dim footsteps of antiquity." But the legislative power moves in a constant stream, and is not exhausted by its exercise in any number of instances, however great. It is not true, however, that the authority over schools was originally regarded as a local one; on the contrary, the earlier cases asserted that the Legislature could not delegate the power to levy taxes for school purposes to local organizations, but must itself directly exercise the power; thus denying, in the strongest possible form, the theory of local control. This ruling was, for many years, regarded as the law of the State; but in the case of *Robinson* v. *Schenck*, 102 Ind. 307, it was held that the Legislature might either exercise the power itself, or delegate it to local governmental instrumentalities. It has, indeed, been the uniform course since the organization of the State, to regulate and control school affairs by legislation. All the public schools have been established under legislative enactments, and all rules and regulations have been made pursuant to statutory authority. Every school that has been established owes its existence to legislation; and every school officer owes his authority to the statute.

It is impossible to conceive of the existence of a uniform system of common schools without power lodged somewhere to make it uniform, and, even in the absence of express constitutional provisions, that power must necessarily reside in the Legislature. If it does reside thére, then that body must have, as an incident of the principal power, the authority to prescribe the course of study and the system of instruction that shall be pursued and adopted, as well as the books which shall be used. This general doctrine is well entrenched by authority. *Hovey* v. *State, ex rel. Carson*, 119 Ind. 395; *Hovey* v. *State, ex rel. Riley*, 119 Ind. 386; *State, ex rel.*, v. *Hawkins*, 44 Ohio St. 98; *State, ex rel.*, v. *Harmon*, 31 Ohio St. 250. Having this authority, the Legislature

may not only prescribe regulations for using such books, but it may, also, declare how the books shall be obtained and distributed.   If it may. do this, then it may provide that they shall be obtained through the medium of a contract awarded to the best or lowest bidder, since, if it be true, as it unquestionably is, that the power is legislative, it must also be true that the Legislature has an unrestricted discretion and an unfettered choice of methods.   It can not be possible that the courts can interfere with this legislative power, and adjudge that the Legislature shall not adopt this method or that method, for, if the question is at all legislative, it is so in its whole length and breadth.   Under our form of government there is no such thing as a power partly judicial and partly legislative; the one power excludes the other, for each is distinct and independent. *State, ex rel.,* v. *Noble,* 118 Ind. 350; *Greenough* v. *Greenough,* 11 Pa. St. 489.   If the Legislature exercises its right to make a choice of methods, by enacting that the books for the schools shall be furnished by the person making the most acceptable bid, the courts can not interfere, because the power exercised is a purely legislative one, and within the legislative domain, courts are forbidden to enter.   There is no escape from this conclusion, save by a denial of legislative independence, and an assertion of the right of judicial surveillance and control.

If the power over the school system is legislative and exclusive, then the Legislature has authority to impose upon all officers whose tenure is legislative, such duties respecting school affairs as it deems proper.  All such officers take their offices *cum onere,* and must do what the Legislature commands or else resign.

It is a mistake to suppose, that the statute under consideration, imposes duties upon the school officers for the benefit of the book dealers.   Not a word in it indicates such an intention.   The purpose of the lawmakers, clearly manifested and expressed, is to secure a benefit to the public.   The ob-

ject of the statute is not to make officers perform duties for the benefit of private individuals, but to make them render services for the benefit of the public, and that benefit results to private persons is an unavoidable incident, not a designed or express provision of the statute. At the time the act was passed it was not known, nor could it be known, what persons would secure the contract for furnishing the books required by law, for it was provided that competition should be invited, and the contract awarded to the lowest bidder.

It may be true that the book dealers are incidentally benefited by the services of the officers, but if that be a sufficient reason for condemning the act, then all statutes providing for the award of contracts by public officers, the certification of accounts or the making of reports, where individuals are interested, must be condemned, since, in every instance, there is an incidental benefit to the dealer or contractor. The truth is, that in no event can a public officer award a contract or certify estimates, accounts, or the like, without at the same time rendering a beneficial service to the person with whom he deals on behalf of the State. If the services of the officer benefit the public, and are imposed for the good of the public, the statute is rescued from successful attack, although the services of the officers may also benefit a private person. Either this is true, or else it is true, that no public officer can be required to award contracts, verify accounts, audit claims, or certify estimates to an individual who has a claim against the State, or any of its municipalities.

The statute is not within the constitutional provisions directed against monopolies. It designates as the standard for the guidance of the State board of education certain books, requires that the books furnished for the use of the schools shall be equal in merit to those named, requires the board to advertise for proposals to furnish the books in a newspaper published in each of the five large cities of the Nation, and

requires the board to award the contract to the lowest bidder. In the section directing the award of the contract it is enjoined upon the board to "ascertain under which of said proposals or propositions the school books" can be furnished to the people of the State for use in the common schools. In another section it is provided, that the books shall be distributed by the township trustees, and that the books shall be sold to the pupils and patrons of the schools. It appears, therefore, that the object of the act is to secure books for the public schools, by means of open competition after full notice.

There is no exclusion of bidders, no limitation of the right to furnish school books to the people of the State to any class; on the contrary, all who are prepared to supply such books as the statute makes the standard are invited to compete for the contract. No special privilege is granted to any one, no right denied to any one, for all are invited to enter the field as competitors.

It is true that the statute declares that the books shall conform to a designated standard, but this standard no one will deny the power of the Legislature to establish. The right to fix the standard is, indeed, a condition essential to the existence of the power; deny the condition, and it must follow, that each father or guardian that controls a pupil may dictate what studies he shall pursue and what books he shall use. Such a result would be most deplorable, for it would produce such chaotic confusion, that the usefulness and efficiency of the school system would be completely and forever destroyed; but the provisions of the Constitution prevent such a result, for they make it the duty of the Legislature to establish a uniform system.

A standard must be fixed in order that there may be fair and open competition, since there could be no intelligent bidding if bidders were not informed what they would be required to furnish. If only a limited class own or control property that the public good demands, then that class is in

the best situation to bid, but this is no reason why the public shall not have the best that their representatives can secure. The utmost that can be done, is to establish a standard, and invite competing bids. If school books can be bought by local boards, or by a State organization, some one publisher must of necessity be favored in every instance where a uniform system is adopted. This result can by no possibility be avoided. If, for illustration, McGuffey's series of readers should be selected as the standard, then the owners of the copyright of that series would be favored to the exclusion of all others. It comes at last to this, either the Legislature may authorize the State board to select the books even though the selection may give peculiar advantage to one publisher, or it can neither buy, nor authorize any one to buy, books protected by copyright. Every one knows that the best books are thus protected, and so they should be, for an author is entitled to the benefit of his work, and it would be sinning against justice to pirate his books.

If no copyrighted books can be bought, then new discoveries and new methods, however important, may be denied the children of our common schools, and this without sufficient reason, for no rule of law prohibits the purchase for public use of articles protected by letters patent or by copyright. A familiar and forcible illustration is supplied by cases of the improvements of streets with patented pavements, at the expense of the property owners.

We conclude our discussion of this phase of the subject by affirming, that the statute can not be considered as creating a monopoly, because it does require that a certain class of books shall be used, and in doing this does favor some publishers to the exclusion of others.

We accept as correct the assumption of appellant's counsel, that the statute does require the people of the State to buy the particular books designated by the proper officer, in obedience to the command of the law, and that, so far as concerns the officers of the State, they must be bought from the

person to whom the State Board of Education awards the contract. We agree fully with appellant's counsel upon this point, for we think that everywhere throughout the statute is manifested the intention to create a uniform system, and to make a body of rules which all school officers are bound to obey. Nor do we doubt, that it was the intention of the Legislature to secure to the person who proved the best bidder in the open competition, so carefully provided for, the exclusive privilege of furnishing the books selected by the State Board of Education, so far as the acts of school officers are involved. Whether it goes further is not a question in this case, for the statute operates upon and through the school officers of the State. It is, indeed, not possible to so construe the statute as to deny the exclusive right of the successful competitor, since the language employed by the Legislature clearly and unmistakably indicates the intention to exercise its power by creating a uniform system, and quite as clearly evinces a purpose to secure the practical enforcement and operation of that system, by vesting in the person to whom the contract may be awarded, the exclusive privilege of supplying books to all the children who enter the schools of the State, so far as the books are supplied through the school officers. Two thing are very clear : one, that the Legislature meant to provide an exclusive privilege, in order to secure books at the best prices ; the other, that the Legislature meant to prevent the possibility of any break in the uniformity of the system framed by the statute.

We can find neither reason nor authority, that suggests a doubt as to the power of the Legislature to require a designated series of books to be used in the schools, and to require, that the books selected shall be obtained from the person to whom the contract for supplying them may be awarded. It is to be remembered that the statute does not command that every person shall buy the books ; it confines the requirement to those who receive the benefit of the public schools. These schools are owned and maintained by the

State, and the State may prescribe the terms and conditions upon which pupils may enter them, except that it can not disregard the constitutional injunction that " tuition shall be without charge, and equally open to all." It may, as we have seen, prescribe the course of study that shall be pursued, and the system of instruction that shall be adopted, and to perfect and complete its control it must have the power to prescribe the books that shall be used, and the mode in which they shall be obtained. In prescribing the mode in which books shall be obtained, the Legislature simply commands that those who enjoy the benefit of the schools which it maintains shall secure such books as it deems best, and in the mode it regards as expedient. Power thus asserted is exercised in a matter which is not of common right, but which concerns institutions founded and fostered by the State. The regulation, in its entire scope, relates exclusively to the enjoyment of the privilege afforded by a system of education created and maintained by the State for the general good, and it must follow that the State does have power to make the regulation effective, by prescribing the method which shall be pursued by those who seek to enjoy the privilege it has created. Certainly no one will deny the existence of such a right, and if it does exist, it must reside in the law-making power of the State.

The regulation of the mode of securing books by the pupils of the common schools is not analogous to a regulation of general property rights, for books are peculiar to schools, and schools are the property of the State. It is no answer to this argument to affirm that the State may not give one person the exclusive privilege of selling fuel, clothing, or the like, to a community, for school books are unlike such property in their chief characteristics, and the Legislature does not assume to declare that any person may not sell books to a community; it simply assumes the power of declaring that the person whom the State board of education decides is the lowest bidder shall have the exclusive priv-

ilege of supplying its schools with books. In doing this, it does no more respecting schools than a private citizen does who contracts with another to furnish him goods for a designated period, nor does it do more regarding schools, than it does with respect to all the public institutions whose officers are authorized to give the exclusive privilege of furnishing groceries, medicines, or other articles to the person to whom a contract covering a designated period is awarded, for the State owns and maintains its schools just as much as it does its public institutions of every kind.

Either the State has power to regulate and control the schools it owns or it has not; that it does not have this power, we venture to say, no one will affirm; if it does have this power, it must reside in the law-making department, for it is impossible for it to exist elsewhere. If the power does reside in the law-making department, then that department must exercise its discretion and adopt such measures as it deems best, and if the measures adopted lead to the exclusion of some book-owners, it is an incident that no ingenuity can escape, nor any system avoid. The denial of the right to select the books is the denial of the right of regulation and control, and we can not conceive it possible to deny this right. If the right of regulation and control exists, then the fact that the exercise of the right does exclude some publisher is an inseparable and unavoidable condition of the exercise of the right. Without it, the right is annihilated. If a clear and manifest legislative right can not be exercised without conferring privileges in the nature of a monopoly, then, as the authorities all agree, a monopoly may be created, for a denial of the right will not be suffered. This doctrine is discussed by Judge Cooley, in his work on torts, and by Mr. Tiedeman, in his work on the police power, to which we refer without comment. Cooley Torts, 277; Limitations of Police Power, 315, *et seq.* But we need not enter the field traversed by these authors, for here there is no denial of a right to sell books to a community; all that is here done is

to provide that the person who secures, after fair and open competition, the contract for supplying books to the school children shall enjoy an exclusive privilege for the period prescribed by the statute.

Judge Cooley says that " It is held competent for the State to contract with a purchaser to supply all the schools of the State with text-books of a uniform character and price." Const. Lim. (5th ed.) 225, n. 1. In *Curryer* v. *Merrill*, 25 Minn. 1 (33 Am. R. 450), it was held that the State might purchase books and compel the patrons of the school to buy the books from its officers. The question was presented in *Bancroft* v. *Thayer*, 5 Sawyer, 502, in substantially the same general form that it is here, and it was held that a State may provide by legislation that a designated person shall have the exclusive privilege of furnishing all the text-books needed for the use of the public schools. This decision was made upon the Constitution of Oregon, which is very similar to ours, and the right to make such a contract is referred to the police power, the court saying: " To authorize and provide that, by means of contract or legislative grant, a particular person or persons shall have the exclusive right to do or furnish a particular thing, upon certain conditions, for the use and convenience of the public, has always been a common mode of exercising the police powers of the State." In the case of *State, ex rel.,* v. *State Board of Education,* 18 Nev. 173, the power of the Legislature to require the adoption and use of the books of a designated publisher was assumed to exist by court and counsel, and this is true of the case of *People, ex rel.,* v. *Board of Education,* 55 Cal. 331. The court held in *People, ex rel.,* v. *State Board of Education,* 49 Cal. 684, that the decision of the State board of education as to the text-books that should be used was final, and must be obeyed by all of the local boards and officers. These authorities, and those to which we have heretofore referred, seem to us to so conclusively settle the question as to leave no room for debate.

If it be true, as the decided cases all affirm, that the State may itself contract for the books and require the patrons of the schools to buy from its officers at a designated price, it must be true, that the State can contract with an individual to supply the books, for the underlying principle is precisely the same. It can make no difference whether the State buys the books and then requires the patrons of the schools to purchase from its officers, or whether it vests the exclusive privilege in an individual by contract, for the decision of the question does not depend upon the parties, but upon the character of the act or transaction. Whether the right to sell is asserted by the state itself or conferred upon an individual can make no difference, since in either case the privilege is exclusive. If the State can itself exercise such a privilege, it can certainly authorize its exercise by an individual.

Our conclusion upon the constitutional questions is in harmony with the judgment of the eminent judge who heard and decided the case of *State, ex rel.,* v. *Blue, post,* p. 600, as well as with that of the learned judge who decided this case, for we agree with them that the statute is constitutional in all its essential features. Whether there are, or are not, isolated and detached clauses that may be invalid we have not inquired, for the reason, that the case as it is presented by the record, and in the very able argument of counsel, requires no such investigation.

The remaining question requires a construction of the statute. The contention of the one party is, that it imposes no imperative duty upon the trustee that can be enforced by mandamus, and that of the other is, that such a duty is imperative and that mandamus is the appropriate remedy.

It is not necessary that a statute should, in direct terms, declare the duty of an officer in order to make it an imperative one. The duty may be deduced from the general provisions and scope of the statute, regard being had to the evil intended to be remedied, and the object sought to be

accomplished.    A familiar illustration of this general doctrine is supplied by the cases which hold that highway officers may be compelled by mandate issued upon the petition of a citizen who has sustained a special injury, to repair a highway, or remove an obstruction.    The cases of *Wren* v. *City of Indianapolis,*96 Ind. 206,and *City of Greenfield* v.*State, ex rel.,* 113 Ind. 597, are apposite examples, for there the duty to issue estimates and proceed with the collection of assessments for the improvement of a street, was deduced from the general provisions of the act for the incorporation of cities. But, without prolonging our opinion by an examination of the decided cases in detail, we adopt, as a fair expression of the conclusion to be deduced from them, this statement of a careful and an accurate author, who, in speaking of the difference between a duty and a privilege, says :   " It has, indeed, been said that no rule can be laid down for determining whether the command is to be considered as a mere direction or instruction involving no invalidating consequences in its disregard, or as imperative, with an implied nullification for disobedience, beyond the fundamental one that it depends on the scope and object of the enactment."   Endlich Interp. Stat., section 443.   This fundamental principle runs parallel with the cardinal rule which affirms that the courts must ascertain and give effect to the intention of the Legislature ; it is, indeed, substantially the same rule expressed in different words to emphasize its application.   *Kellogg* v. *Page,* 44 Vt. 356 ; *Corbett* v. *Bradley,* 7 Nev. 106.   Our own decisions are collected and well discussed in *Middleton* v. *Greeson,* 106 Ind. 18.   The question which here emerges is :   Do the provisions of the statute concerning school trustees impose a duty or confer a privilege ?   Or, to particularize :   Do those provisions require all township trustees to adopt the books and thus give practical effect to the statutory scheme as a complete and symmetrical system, or do they put it in the power of each trustee to break the uniformity by refusing to procure the books ?   If it be true that township trustees

may, at their pleasure, procure or refuse to procure the books for which the State board contracts, then the statute is nullified in so far as it assumes to confer a right upon the contractor, to supply the people of the State with school books. Grant the right of each of the school trustees to determine for himself whether he will or will not procure the books, and it may result that the contract will operate in very few only of the townships of the State, and this, as we shall presently show, was a result the Legislature intended to prevent.

It is, as we have suggested, always proper to ascertain the object intended to be accomplished, and for this purpose it is proper to look to the history of the times, to the cause which induced the enactment of the statute, and to consider, also, the evil intended to be remedied. Again and again has this doctrine been asserted by this court, and in asserting it the court did no more than enforce a rule much older than the State. *Krug* v. *Davis*, 87 Ind. 590, and cases cited; *Bell* v. *Davis*, 75 Ind. 314; *Clare* v. *State*, 68 Ind. 17; *State* v. *Canton*, 43 Mo. 48; *People, ex rel.*, v. *Lacombe*, 99 N. Y. 43.

One who would give a just interpretation to the language of a statute must always give due consideration to the history of the enactment. Speaking of the duty of one who undertakes to interpret a statute, the author quoted says: "He must refer to the history of the times to ascertain the reason for, and the meaning of the provisions of a statute, and to the general state of opinion, public, judicial and legislative at the time of the enactment." Endlich Interp. Stat., section 29. Illustrations of this well known rule are supplied by the cases of *Aldridge* v. *Williams*, 2 How. 8; *United States* v. *Union Pac. R. R. Co.*, 91 U. S. 72; *District of Columbia* v. *Washington Market Co.*, 108 U. S. 243; *State, ex rel.*, v. *Nicholls*, 30 La. Ann. 980; *Keyport, etc., Co.* v. *Transportation, etc., Co.*, 18 N. J. Eq. 13; *Delaplane* v. *Crenshaw*, 15 Gratt. 457. The information imparted by the inaugural address of the Governor of the State, by the debates in the General

Assembly, and by the reports of the legislative committees, makes clear the object sought to be accomplished, and reveals the evil it was the legislative purpose to remedy. It is manifest that to so construe the statute as to enable township trustees to refuse to make reports, or to prepare certificates, or to procure books, would defeat the leading purpose of the Legislature. No one who attends to the history of the times can doubt that it was the legislative intention to require all school officers to procure the books for the pupils from the person to whom the State board of education should award the contract. It was, too, the intention of the Legislature to equalize prices, to prevent one locality from being compelled to pay a much greater price for books than another, to put it beyond the power of local officers to mar the uniformity of the system, to prevent favoritism, and to open the field to competition. To this end, the Legislature constructed a system which required competitive bidding, and, to make sure that the best prices might be obtained, provided that whoever secured the contract should have the exclusive privilege of furnishing all the books designated and required by the State board. To permit the local school officers to treat the provisions of the statute as the grant of a privilege would prevent the attainment of this end. To give effect to the intention of the Legislature, and to secure the accomplishment of the principal object of the statute, it must be held that its provisions create a legal duty which the trustees can not put on or off at pleasure. To hold otherwise would effectually destroy the symmetry of the statute, and so cripple its machinery as to render it useless, and this we can not do in the face of the historical facts which were laid before the General Assembly by the Governor, considered in the reports of the committees of that body, and debated by its members. We know as matter of history, imparted to us by the most authentic records and in the most public method, that, with little diversity of opinion, it was agreed that there were great evils to be remedied. The difference of opinion was not so much

as to the existence of the evil and the necessity of a remedy as it was respecting the nature of the remedy that should be resorted to for the cure of the evil.

Before turning to the language of the statute it is proper to refer to an ancient and well known rule of law, which is not without influence here. An English writer says: . " It has, indeed, been said to have become an axiom, that ' in public statutes words only directory, permissory or enabling, may have a compulsory force where the thing to be done is for the public benefit, or in advancement of public justice.' " Heard's Shortt Extraordinary Rem. 255. An American court has thus stated the rule: " The grant by the Legislature, of an official power, involves a corresponding public duty; and where the power is not expressly discretionary, its exercise is a peremptory public duty." The same court also said: " Public official powers must be supposed to be granted from public motives, and for the public good, and their exercise is not a matter of discretion, unless expressly made so." *People, ex rel.*, v. *Supervisors*, 11 Abb. Pr. 114. The rule was thus expressed by our own court: " Where the words of the statute are permissive merely, in cases where public interests or rights are concerned, and where the public or third persons have a claim *de jure*, that the powers should be exercised, they will be construed as obligatory." *Gray* v. *State, ex rel.*, 72 Ind. 567. Other cases declare the same doctrine. *Bansemer* v. *Mace*, 18 Ind. 27 ; *State, ex rel.*, v. *Buckles*, 39 Ind. 272 ; *City of Indianapolis* v. *McAvoy*, 86 Ind. 587. That the statute here under examination contains provisions concerning public rights, and rights in which individual patrons of the schools have an interest, is too clear for denial ; and therefore this rule forcibly applies.

An analysis of the provisions of the statute submitted to the light of the principles we have stated will make clear its meaning and object. Section 1 constitutes the State board of education commissioners for the purpose of making selec-

tion of text-books for use in the common schools, and designates the standard which shall guide the board in the selection of books. Section 2 commands the board to advertise for proposals in two daily newspapers in this State, and one in the cities of New York, Philadelphia, Cincinnati, Chicago, and St. Louis, and directs what the action of the board shall be. Section 3 requires the board to examine all proposals for furnishing " school books to the people of the State for use in the common schools." Section 4 provides that if books can be furnished " cheaper to the patrons for use in the common schools of this State," from manuscript, the board shall invite proposals for manuscript and not for books. Section 6 provides that as soon as the board shall have entered into a contract it shall be the duty of the Governor to issue his proclamation " announcing such fact to the people of this State." Section 7 provides that when the Governor shall have issued his proclamation it " shall be the duty of the school trustees of each and every school corporation in this State, within thirty days thereafter, and at such other times as books may be needed for use in the public schools of their respective corporations, to certify to the county superintendent of their respective counties the number of school text-books provided for in such contract required by the children for use in the schools of their several school corporations." In this section it is made the duty of the school superintendent to make a requisition for such books upon the contractor, and it is further made the duty of the superintendent, upon the receipt of the books, to immediately notify all of the township trustees of the receipt of such books. This section also declares that " It shall then be the duty of such school trustees to immediately procure and take charge " of such books, and that " upon the receipt of such books by said school trustees they shall furnish them on demand to the school patrons or school children of their respective corporations at the price fixed therefor by the contract entered into between said board of commissioners and said contractor."

It is also provided in the same section that books may be purchased from the superintendent. Section 8 makes it the duty of each trustee to make a report of the books received, the number sold, and the number on hand, and section 9 prescribes a penalty for a breach of duty.

From this synopsis these important things are made manifest: The books are to be secured for all the schools of the State. Everywhere throughout the statute the terms employed refer to the entire State, never to localities. Every provision indicates an intention to establish a uniform system, and not a provision indicates an intention to put it in the power of any officer to break the uniformity. The duty is enjoined upon all of the trustees of the State; none are excepted. The books are all to be furnished under the contract, and furnished without exception for all the schools of the State. The only method for securing the books is through contract. The conclusion that the law is obligatory upon every school trustee within the State is, therefore, irresistible, From beginning to end there is no hint or suggestion that some of the trustees may, and some may not, obey the law, and procure or decline to procure the books under the contract made by the State board. There is not the remotest suggestion from which it can be inferred that the system constructed shall be treated otherwise than as a unit. Nor is there a word from which it can be inferred that the Legislature intended that inferior school officers might exercise discretionary power, and thus break and deform the uniformity and symmetry of the system. All we know of the history of the enactment, all we can discover as to the object of the statute, and all that we have learned of the evil sought to be remedied, combine with the words of the statute (words clear in themselves, but clearer still from the light shed upon them by extrinsic facts which it is our duty to know and which we do know) in support of the conclusion, that the statute creates a uniform system, requires that all books be procured under the contract, and that school trustees may

not exercise discretionary powers, but shall perform the duty enjoined upon them by procuring and distributing the books selected by the State board of education as the law commands.

Upon the petition of a citizen, courts have enforced a duty less clear and imperative than that which rests upon the appellee, but the length of this opinion (excusable, if excusable at all, because of the magnitude and importance of the questions involved) forbids that we do more than refer to the cases. *State, ex rel., v. School Directors, etc., supra; School Commissioners, etc., v. State Board,* 26 Md. 505; *Maddox* v. *Neal,* 45 Ark. 121 (55 Am. R. 540).

For the error in holding that the duty imposed upon school trustees is not imperative, the judgment must be reversed.

Judgment reversed, with instructions to proceed in accordance with this opinion.

Filed March 13, 1890.

### SEPARATE OPINION.

OLDS, J.—I concur in the conclusion reached in the principal opinion, but not in all the statements and arguments contained in it.

I do not think the statute in question in conflict with any express provision of, or the spirit of the State Constitution, nor do I think it an encroachment on the rights of the citizens of the State not delegated to the legislative department of the State government by the Constitution. In reaching this conclusion I do not concur in the broad statement of counsel for the appellant that before the law can be declared unconstitutional and void, some express provision of the Constitution must be pointed out which prohibits such legislation; but I adhere to the doctrine recently enunciated by this court, that the grant of power to the legislative department is a grant only of all legislative power, and that there are some rights of the people which can not be taken away by legislative enactment, notwithstanding there is no pro-

The State, *ex rel.* Clark, *v.* Haworth, School Trustee, Etc.

vision in the Constitution expressly prohibiting such legislation.

The common schools of the State are in the main supported by the State, and the tuition is free. The Constitution expressly enjoins on the General Assembly the duty " to encourage by all suitable means, moral, intellectual, scientific and agricultural improvement, and to provide by law for a general and uniform system of common schools, wherein tuition shall be without charge and equally open to all." By the Constitution the common schools of the State are expressly placed under the control and supervision of the General Assembly. It is made the duty of that department of the State government to provide for a uniform system; this must relate to books, as it is manifestly essential that there must be a uniformity in books to secure proper efficiency in the schools, and such uniformity can only be brought about and maintained by legislation, providing for the adoption and use of certain books. Whether there should be a uniformity in the books of but a single school, or whether one system and the same class of books should extend to all schools in a township or county, or in the schools of the whole State, is a matter of policy to be considered by the General Assembly in the passage of laws to govern the common schools in this respect. This uniformity in books has always been controlled by legislation, and I think properly so, and it is committed to the General Assembly by the provisions of the Constitution.

When once admitted that it is subject to legislative control at all, as it seems to me it must be, then it is exclusively within the province of the General Assembly to determine whether there shall be a uniformity of books in a single school or the schools of a township, county or State, and the manner by which the books to be used shall be adopted, and courts can in no way interfere.

I do not believe the General Assembly has power to create a monopoly, nor do I believe they have done so in the pas-

sage of this statute.   School-books are usually copyrighted, and when adopted under the system provided for in the law under consideration, or under any other law, or in any manner so that the parent or child is required to purchase the particular kind of a book or books used in the school the child attends, they of necessity have to purchase of the person or persons publishing and controlling the copyright of the particular book or books used in the school; or, if not copyrighted, of the person or persons publishing the particular books.   Under the old system of adopting books which it is not contended is objectionable to the provisions of the constitution, when books were adopted for use in the township or county, the patrons of the schools had, of necessity, to purchase the books directly, or indirectly, of the person or persons who controlled and published the books adopted.   If the present law creates a monopoly, the old law likewise created one, differing only in extent, the present system not having so many of the features of a monopoly, as it provides for a competition before the adoption, and the old did not.   The necessity of uniformity in books exists, and the Constitution expressly enjoins the duty on the General Assembly to provide for it; and to have uniformity requires that the books be purchased of the person or persons publishing and controlling the particular books used.

While the contract entered into between the State board of education and the school-book company does not possess the usual elements of mutuality, and may be of doubtful validity as a contract, yet I think the action of the State board of education, under the law, amounts to an adoption of the particular books to be used in the common schools.

It has been suggested by counsel that if this act be valid, then the Legislature may pass laws of the same character relating to any merchantable article which citizens purchase one from another, or even relating to the clothing of school children, or some matter about which there is no necessity for uniformity.   But as between the law under consideration

and laws of the character suggested, there is a decided difference. If the law related to ordinary merchantable articles, purchased in the common and ordinary dealings between citizens, or related to clothing of school children, or to some matter about which there was no necessity for any uniformity, then I would concede at once that such legislation was beyond the power of the General Assembly, and not contemplated by the Constitution; but the question under consideration is entirely different, it is legislation concerning a matter for which there is a necessity for system and uniformity, and the duty of providing for a uniform system is expressly enjoined upon the General Assembly by the Constitution.

The services to be performed by the township trustees, who are school officers, are to be done for the public. The paramount object of the services to be rendered is to put in force the law and execute it, by requiring the school officers of the townships to keep the particular books where all patrons of the schools may easily obtain them, and to require that such books be used in the schools, and while the services of the trustees may incidentally benefit the persons furnishing and selling the books, yet I do not regard that this fact renders the law invalid.

As to whether the law repeals the old law, and whether it is mandatory or not, it seems to me that from the reading of the whole act there can be no question as to what was the legislative intent, and that such intent was to establish a uniformity in school books throughout the State, and that it was intended to supersede and take the place of all other laws on the same subject.

As to whether the law is a salutary one or not, and as to whether it will prove beneficial or detrimental to the common school interest of the State, are matters about which the court has nothing to do; these questions were with the General Assembly, and determined by them in the passage of the law.

Filed March 13, 1890.

### DISSENTING OPINION.

BERKSHIRE, J.—I can not agree to the conclusion reached in the opinion of the court, and feel called upon therefore to state in as few words as possible my reasons for the position which I assume; and that the conclusions which I draw as to the provisions and requirements of the act of March 2d, 1889, may be the better understood, I herein set out most of the sections of the act in full.

The first section provides, that the State board of education shall constitute a board of commissioners for the purpose of making a selection or procuring the compilation for use in the common schools of the State of Indiana of a series of text-books in certain branches named, and fixes a standard as to the matter and quality of the books.

Section 2 is as follows: " The said board of commissioners shall, immediately upon the taking effect of this act, advertise for twenty-one consecutive days in two daily papers published in this State, having the largest circulation, and in one newspaper of general circulation in the cities of New York, Philadelphia, Cincinnati, Chicago and St. Louis, that at a time and place to be fixed by said notice, and not later than six months after the first publication thereof, said board will receive sealed proposals on the following : *First*. From publishers of school text-books for furnishing books to the school trustees of the State of Indiana for use in common schools of this State, as provided in this act, for a term of five years, stating specifically in such bid the price at which each book will be furnished, and accompanying such bid with specimen copies of each and all books proposed to be furnished in such bid. *Second*. From authors of school text-books, who have manuscripts of books not published, for prices at which they will sell their manuscript, together with the copyright of such books for use in the public schools of the State of Indiana. *Third*. From persons who are willing to undertake the compilation of a book or books, or a series of

books, as provided for in section one (1) of this act, the price at which they are willing to undertake such compilation of any or all of such books, to the acceptance and satisfaction of the said board of commissioners : *Provided*, That any and all bids by publishers, herein provided for, must be accompanied by a bond in the penal sum of fifty thousand dollars, with resident freehold surety to the acceptance and satisfaction of the Governor of this State, conditioned that if any contract be awarded to any bidder hereunder, such bidder will enter into a contract to perform the conditions of his bid to the acceptance and satisfaction of said board : *And provided, further,* That no bid shall be considered unless the same be accompanied by the affidavit of the bidder that he is in nowise, directly or indirectly, connected with any other publisher or firm who is now bidding for books submitted to such board, nor has any pecuniary interest in any other publisher or firm bidding at the same time, and that he is not a party to any compact, syndicate or other scheme whereby the benefits of competition are denied to the people of this State : *And be it further provided,* That if any competent author or authors shall compile any one or more books of the first order of excellence, and shall offer the same as a free gift to the people of this State, together with the copyright of the same, and the right to manufacture and sell such works in the State of Indiana.for use in the public schools, it shall be the duty of such board of commissioners to pay no money for any manuscript or copyright for such book or books on the subject treated of in the manuscript so donated ; and such board shall have the right to reject any and all bids, and at their option such board shall have the right to reject any bid as to a part of such books, and to accept the same as to the residue thereof."

Section 3 is as follows : " It shall be the duty of such board to meet at the time and place mentioned in such notice, and open and examine all sealed proposals received pursuant to the notice provided for in section two (2) of this

act; and it shall be the further duty of such board to make a full, complete and thorough investigation of all such bids, or proposals, and to ascertain under which of said proposals or propositions the school books could be furnished to the people of this State for use in the common schools at the lowest price, taking into consideration the size and quality as to matter, material, style of binding, and mechanical execution of such books: *Provided, always,* That such board shall not in any case contract with any author, publisher or publishers, for the furnishing of any book, manuscript, copyright or books, which shall be sold to patrons for use in the public schools of this State at a price above or in excess of the following, which prices shall include all cost and charges for transportation and delivery to the several county school superintendents in this State, namely: For a spelling-book, ten (10) cents; for a first reader, ten (10) cents; for a second reader, fifteen (15) cents; for a third reader, twenty-five (25) cents; for a fourth reader, thirty (30) cents; for a fifth reader, forty (40) cents; for an arithmetic, intermediate, thirty-five (35) cents; for an arithmetic, complete, forty-five (45) cents; for a geography, elementary, thirty (30) cents; for a geography, complete, seventy-five (75) cents; for an English grammar, elementary, twenty-five (25) cents; for an English grammar, complete, forty (40) cents; for a physiology, thirty-five (35) cents; for a history of the United States, fifty (50) cents; for copy-books, each, five (5) cents."

Section 4 is as follows: "If, upon the examination of such proposals, it shall be the opinion of such board of commissioners that such books can be furnished cheaper to the patrons for use in the common schools in this State by procuring and causing to be published the manuscript of any or all of such books, it shall be their duty to procure such manuscript and to advertise for sealed proposals for publishing the same, in like manner as hereinbefore provided, and under the the same conditions and restrictions. And such contract may be let for the publication of all of such books, or for any one

or more of such books separately; and it shall be the further duty of such board of commissioners to provide, in the contract for the publication of any such manuscript, for the payment by the publisher of the compensation agreed upon between such board and the author or owner of any such manuscript, for such manuscript, together with the cost or expense of copyrighting the same."

Section 5 is as follows : " It shall be a part of the terms and conditions of every contract made in pursuance of this act that the State of Indiana shall not be liable to any contractor hereunder for any sum whatever; but that all such contractors shall receive their pay and compensation solely and exclusively from the proceeds of the sale of the books, as provided for in this act."

Section 6 is as follows : "As soon as such board shall have entered into any contract for the furnishing of books for use in the public schools of this State, pursuant to the provisions of this act, it shall be the duty of the Governor to issue his proclamation announcing such fact to the people of this State."

Section 7 is as follows : " When such proclamation shall have been duly issued, it shall be the duty of the school trustees of each and every school corporation in this State, within thirty days thereafter, and at such other times as books may be needed for use in the public schools of their respective corporations, to certify to the county superintendent of their respective counties the number of school textbooks provided for in such contract required by the children for use in the schools of their several school corporations. Such county superintendent shall forthwith make such requisition for books, as the schools in the said several counties may require, upon the State superintendent of public instruction, and the said State superintendent of public instruction shall immediately thereafter make a requisition for said books upon the contractor, who shall within ninety days ship the books so ordered directly to the county school superinten-

dents of the several counties of this State. Upon the receipt of such books it shall be the duty of such county school superintendents to immediately notify all the school trustees of the school corporations as shown by the last school enumeration of their counties of the receipt of such books. It shall then be the duty of such school trustees to immediately procure and take charge and custody of all the books assigned to their several school corporations, receipting therefor to the said county school superintendent; and upon the receipt of such books by said school trustees they shall furnish them on demand to the school patrons or school children of their respective corporations at the price fixed therefor by the contract entered into between said board of commissioners and said contractor ; and it shall be the duty of such school officers to sell such books for cash only ; and if they shall sell or dispose of any books other than for the cash price thereof, they shall be held personally liable, and liable upon their official bond for the price of such book or books : *Provided,* That any patron or pupil of any school or schools other than the public schools, and also any child between the ages of six and twenty-one years of age, or the parent, guardian or teacher of such child, shall have the right to purchase and receive the books, and at the prices herein named, by payment of the cash price thereof to the school superintendent of any county in this State, and it is hereby made his duty to make requisition upon the contractor for any and all books so ordered and paid for by any such person or persons : *And provided further,* That nothing in this act shall operate to prevent the State board of education, boards of school trustees or boards of school commissioners from devising means and making arrangements for the sale, exchange or other disposition of such books as may be owned by the pupils of the schools under their charge at the time of the adoption of books under the provisions of this act."

Section 8 reads as follows : " At the expiration of three months after the receipt of such books by the county super-

intendent, and every three months thereafter, it shall be the duty of each school trustee receiving and chargeable with books under the provisions of this act, to make a full and complete report to the county superintendent of the number of books sold and the amount of money received therefor, and the number of books on hand ; and at the time of making such report he shall pay over to the county superintendent all moneys received by him or with which he is chargeable, from the sales of books in his hands; which report shall be duly verified by the oath of the party making it."

Section 9 is as follows: " If, at the expiration of ten days from the time required by this act for the making of such report of any school superintendent chargeable with books under this act, any such officer shall have failed, neglected or refused to make such report, or turn over any moneys with which he is chargeable, it shall be the duty of the county school superintendent, within fifteen days, to enter suit upon his official bond for an accounting and recovering of any moneys due from him on account of such books with which he is chargeable ; and all judgments recovered upon such bonds shall include a reasonable attorneys' fee for the attorney prosecuting such suit ; and such judgment shall be without relief from valuation or appraisement laws, and shall be without stay of execution."

Section 10 reads as follows: "It shall be the duty of the several county school superintendents of this State, within thirty days from the issuing of the proclamation by the Governor, as hereinbefore provided for, and of every county school superintendent hereafter elected, before he enters upon the discharge of his official duties, to enter into a special bond, with at least two freehold sureties of such county, payable to the State of Indiana, conditioned that they will faithfully and honestly perform all the duties required of them by this act, and account for and pay over all moneys that may come into their hands pursuant to the provisions of this act, in a penal sum which shall be equal in amount to one hundred dollars for

every one thousand inhabitants of their respective counties as shown by the last census immediately preceding the giving of such bond, to be approved by the board of commissioners of their respective counties; and upon the failure of any county school superintendent to give such bond, his office shall become immediately vacant, and the board of commissioners of his county shall immediately appoint some competent and suitable person to fill such vacancy for the unexpired term of his office."

Section 11 is as follows: " It shall be the duty of each county school superintendent in this State, within ten days after the quarterly reports of the school trustees, as hereinbefore provided for, to make a full, true, complete and detailed report to the contractor of all books sold by the several school trustees of his county, and of the number of books in the hands of the trustees of each school corporation, which report shall be accompanied by all cash received by him from the school officers from sales of books by them sold, and which report shall be duly verified by him, and a duplicate thereof shall be filed in the office of the auditor of his county. Upon the failure of any county school superintendent to make the report and to transmit the cash, as required by this section, a right of action shall immediately accrue to the contractor against the said school superintendent and the sureties upon the bond provided for in this act, for an accounting and for the recovery of any moneys received and not transmitted by him, and for any damages which may have resulted from his neglect or failure to comply with the provisions of this act, and any judgment upon any such bond shall include a reasonable fee for the attorney prosecuting such suit, and such judgment shall be without relief from valuation and appraisement laws and shall be without stay of execution."

Section 12 makes it a misdemeanor for a school trustee to charge or receive more than the price fixed by the contract with the State for the books.

Section 13 makes it embezzlement in any trustee or county

superintendent if he fraudulently fail to account for and pay over to the proper person or persons moneys in his hands, or to account for school books received by him and unsold under the provisions of the said act.

In my opinion the whole act is in violation of the Constitution of the United States, and in violation of section 23, article 1 of the Constitution of the State of Indiana, and, therefore, void. Said last named section reads as follows: "The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens."

In my judgment, under and by virtue of said act, the Indiana School Book Company is "granted privileges and immunities" which upon the same terms do not belong to other citizens, natural or artificial.

It is true that the act provides that the board of commissioners named therein shall advertise for sealed proposals from publishers, authors, and persons willing to undertake the compilation of books to be used in our public schools, and authorizes the said board to accept the bid which seems to be the most advantageous under all the circumstances, and to enter into a contract with such bidder. But it is expressly provided in said section 5 that under no consideration is the State to become liable to any contractor in any sum whatever.

The books to be furnished, therefore, are not sold to the State, nor are they sold to the patrons of the schools by virtue of the arrangement which the State and the contractor make.

It requires another transaction, complete and perfect in itself, between the contractor and the patrons of the school, to divest the ownership of the contractor in the books which he is to furnish, and to vest the ownership thereof in the patrons of the school, and just the same character of transaction as though there had been no arrangement or contract between the State and the contractor.

It seems to me that the most that can be said or claimed for the contractor is, that the contract or arrangement extends to him the privilege, to the exclusion of other persons, of supplying the public schools with text-books. But it is made the duty of the trustees of the several school townships in the State to certify within thirty days after the Governor has issued his proclamation as required by the act, and thereafter as books are needed for use in the schools to the county superintendents of their respective counties, and it is made the duty of the several county superintendents upon receiving the certificates of the trustees, to make a requisition upon the superintendent of public instruction for the books required for their several counties, who makes a requisition upon the contractor, who within ninety days ships the books required for each county to its county superintendent.

When the books are received by the county superintendent it is made his duty to notify the trustees, and it then becomes their duty, to take charge of the books going to their respective townships, first receipting therefor to the county superintendents. And after receipting for and taking into his possession the books for his township, it is made the duty of the trustee to put them on sale, and on demand for cash, at the price fixed upon by the State and the contractor to furnish them to the patrons of the schools of his township; and to the patrons of other schools than public schools, and to any child over six and under twenty-one years of age, it is made the duty of the several county superintendents to make requisition for and furnish books for cash and at the price fixed upon by the State and the contractor. And it is made the further duty of the trustee to report to the county superintendent quarterly the state of the book trade, giving the number of books sold, the amount of money received therefor, and the number of books unsold and on hand; and at the same time to pay over to the county superintendent all moneys received by him or with which he is chargeable; and if he fails to make the report or to pay over the moneys, it

is made and becomes the duty of the county superintendent within fifteen days thereafter, to institute suit upon the bond of the trustee so in default, and it is provided that in addition to the amount found due, the judgment shall include a reasonable fee for the plaintiff's attorney, and the trustee and his sureties are deprived of the benefit of valuation and appraisement laws, and of the benefit of all laws for the stay of execution.

The several county superintendents are required to give a separate bond for the benefit of the contractor, and if any superintendent fails to give this bond, his office is declared vacant.

Each county superintendent, within ten days after he receives the quarterly reports of the trustees, is required to make a full and complete report, not to his superior officer, the superintendent of public instruction, but to the contractor, of all books sold, and of those still unsold in the hands of the trustees; which report shall be accompanied by the money in his hands, the proceeds of the sales made by the trustees.

To what extent the county superintendent must travel, or the point to which he must go to make this report, the law does not provide; it must be, therefore, to the headquarters or place of business of the contractor, wherever that may be (if he reports in person), as the rule is that whenever an inferior officer is required to report to a superior, he is required to go to the headquarters or place of business of his superior. It may be that the county superintendents can make their reports to the contractor by mail or express, and thus transmit the moneys in their hands at their own risk; as to that I am not prepared to say.

If a county superintendent fails to make the report required of him, or to pay over the money in his hands, a right of action at once accrues to the contractor upon his said bond, and the judgment rendered is increased over and

above the amount. found due to the extent of a reasonable fee for the contractor's attorney, and is rendered without relief from valuation and appraisement laws, and without the benefit of all laws for the stay of execution. And if any county superintendent or school trustee fraudulently fails to pay over any moneys in his hands when called upon by the proper person, or to turn over unsold books received by him, the law declares him guilty of the crime of embezzlement.

To me this seems to be one of the most remarkable laws ever enacted by any legislative body, to say the least of it. It not only creates a monopoly, but, in my judgment, as bad and as offensive one as could well be created by a legislative body.

Blackstone's definition of a monopoly is as follows: "Monopolies are a license or privilege allowed by the king for the sole buying and selling, making, working or using of anything whatsoever, whereby the subject in general is restrained from that liberty of manufacturing, using or trading which he had before." Cooley's Blackstone, Bk. 4, p. 157.

This definition is accepted and adopted by. Justice FIELD in *Butchers, Union, etc., Co.* v. *Crescent City, etc., Co.*, 111 U. S. 746, and is recognized everywhere as authoritative.

The exclusive privileges granted to the Indiana School Book Company under the legislative act in question fall exactly within Blackstone's definition, and clearly and unmistakably within the inhibition of the State Constitution.

Not only is the school book company granted the exclusive right for the period of five years to supply the common schools with certain text-books, but local public officers, at great expense to the people of the State, and if needs be to the neglect of their public duties, are made the agents of the contractor to dispose of its books, and placed under most severe penalties, criminal as well as civil, in case they fail to perform the duties which under the law they owe to the contractor.

Under the severe and strict requirements of this act every

school trustee is required involuntarily to open up a branch establishment for the Indiana School Book Company.

It is claimed by the appellant that the law is mandatory upon all the public servants of the State, upon whom it imposes duties, and with this contention I agree. It is not only mandatory, but is so to that extent, that though text-books from the same plates from which are issued the books to be furnished by the Indiana School Book Company were placed in the hands of the trustees, they would not be authorized to put them on sale to be used in the schools, for the law and the contract entered into between the school book company and the State grants to the company the privilege of furnishing the books, and this means all the books, and places the duty upon the trustees of carrying out the promises of the State, and should the trustees sell books belonging to other persons, and allow them to be used in the schools, the promises of the State would be broken.

I purposely omit the word *obligation,* but use the word *promise,* because under the arrangement I do not think the State has obligated itself.

But to pass on ; the State having promised the school book company that it should have the privilege of furnishing all the books, in my judgment the promise of the State is broken, if the school trustees allow books purchased anywhere to be used in the schools except through them as the agents of the school book company.

The law requires the trustee to certify the number of books the schools of his township need, for which a requisition is made, and these books are placed in the hands of the trustees ; and out of the books so furnished, the contractor is entitled to have all the children supplied, and if more are needed that a further requisition be made.

It was evidently the intention of the General Assembly that the books required for the schools should be furnished by the contractor as provided for in the act. Otherwise some

provision would have been made giving to the patrons an opportunity to get books elsewhere of the same series.

The law grants such privileges and immunities to the Indiana School Book Company as were evidently, in my judgment, intended to be inhibited by the Constitution, and can not be upheld (if that would remove the objections to it) on the ground that it falls within the police power of the State as a law to improve the sanitary condition of the public, or to protect it against immorality. Indeed, this is not seriously contended. The act in question must stand, if at all, upon section 1, article 8, of the State Constitution, which reads as follows: " Knowledge and learning generally diffused throughout a community being essential to the preservation of free government, it shall be the duty of the General Assembly to encourage by all suitable means, moral, intellectual, scientific, and agricultural improvement, and to provide by law for a general and uniform system of common schools, wherein tuition shall be without charge, and equally open to all." But this constitutional provision must be construed with other constitutional provisions, and in the light of the Federal Constitution, and I claim when it is so construed, exclusive privileges and immunities can not be granted by the Legislature to one citizen or to a class of citizens under the pretence of building up or providing for a general school system. It is wholly unnecessary to the maintenance of a general and uniform system of common schools, that exclusive privileges and immunities be granted to any citizen or class of citizens, and nothing of the kind was ever contemplated by the framers of the Constitution. But it is contended that the exclusive right to supply the common schools with textbooks was sold to the lowest bidder, and as an opportunity was then offered to all persons who desired to bid and compete for the privilege, that the right which the school book company claims to have acquired is free from all the elements of a monopoly.

The argument is fallacious and unsound. The *modus op-*

*erandi* by which the General Assembly grants to a citizen, or class of citizens, privileges and immunities, which on the same terms are not open to all citizens, is wholly immaterial. It is the thing done, and not the manner of doing it, that taints the act or transaction.

Exclusive privileges or immunities granted to one or more citizens are none the less objectionable, and none the less within the constitutional inhibition, because sold to the lowest bidder, than if granted without an opportunity for competitive bids.

I do not controvert the proposition which was suggested in argument by way of illustration, that if the State desired to purchase any number of school books to be delivered at once or in the future, or to build a State-house, or to let a contract for supplies for its benevolent institutions, that to let the contract to the lowest and best bidder would be a very proper thing to do, although I apprehend if there was no fraud, the State might go into the market and contract with whom it pleased, and its contracts would be valid and binding. In either case there would be no monopoly, but a simple case of bargain and sale, as between two natural persons. But that is not this case. The State has no interest in the contract, nor in the subject-matter of the contract. After the requisition for the books upon the school book company (which is a mere notice to it) by the superintendent of public instruction, the books are shipped to the county superintendent, and by him delivered to the trustees, by them sold, and the money paid over to the county superintendents, and by them paid over to the school book company. Neither the State, nor its officers, have any control over the books at any time or place, nor anything to do with the proceeds arising from sales, nor have the local officers any relations in any way with the State or its officers. If the local officers fail to do their duty, all rights of action for the failure accrues to the contractor. Until the books are sold they remain the property of the school book company.

If loss should occur by fire or otherwise, it would fall on the school book company, unless, probably, if the trustee or county superintendent, from want of care, were to permit any of the books to be damaged or destroyed, in view of the extreme solicitude which the law has for the interests of the contractor, the loss would fall upon such officer, notwith-standing he is an involuntary agent of the school book company.

But, further, in this connection, until the books are sold to the patrons of the school, they have not been furnished to anyone. The school book company has delivered them to the trustee for sale, the same as the manufacturer delivers his wares to the middle-man to dispose of to the consumer. Under this law the trustee occupies the position of middle-man between the school book company and the patrons of the school.

What is it, then, which the school book company acquired by its so-called contract with the State? The privilege, pure and simple, of supplying the common schools of the State with text-books to the exclusion of every other person, natural or artificial. All other school-book publishers and dealers are cut off from furnishing books to be used in the schools; the patrons, as we have said, must purchase in the manner provided, and from the dealer who by virtue of the law has been designated.

The *Slaughter-House Cases*, found in 16 Wallace, beginning with page 36, sustain the act of the Louisiana Legislature upon the one ground that the subject-matter which the act covered came within the police power of the State, and in those cases four out of the nine judges dissented, on the ground that in their judgment the law was unconstitutional.

In the case of *Butchers' Union, etc., Co.* v. *Crescent City, etc., Co., supra,* the law that had been sustained in the former cases was again before the Supreme Court, and it was held that the power of a State Legislature to make a contract, which can not be abrogated or modified,

does not extend to subjects affecting the public health and public morals, and that although the law there in question had given exclusive rights and privileges to the Butchers Union, etc., Co., for a period of twenty-five years, the Legislature of Louisiana had power to abrogate or modify the rights and privileges thus granted. In that case all of the judges concurred in the conclusion reached, but four out of nine adhered to their former views, that the law was unconstitutional because it granted exclusive privileges.

It will hardly be conceded by the appellant or the Indiana School Book Company, that the law here in question may be repealed or modified by the Legislature, so as to abrogate or modify the school book company's privileges acquired under the law. Upon the other hand, the claim of the school book company must be, and is, that its contract with the State is a valid and binding contract, under which it has acquired valuable privileges which the Legislature can not abrogate or modify, and that it has acquired the exclusive right to furnish the common schools with text-books for the period of five years, and if the contract extended over a period of fifty years the claim would be the same, and would rest upon an equally solid foundation. This position may well be assumed if the law in question is constitutional, and the contract or arrangement which has been entered into binding. Authorities to support this claim or position are abundant, and among others, is the case of *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, and two other cases in the same volume which immediately follow the case named. But those cases rest upon the ground that the party who obtains the privilege is acting in the capacity of an agent for the State, or has undertaken to perform a public duty or public service for the State. None of which has the Indiana School Book Company undertaken or assumed.

The State was not preparing, and has at no time proposed, to furnish the patrons of the common schools with text-books, nor did it owe any duty in that direction—at least, if

it did, it has been a long neglected duty.   I do not say that the State might not, with great propriety, furnish school books to the patrons of the public schools, but what I do say is, that it owes them no such duty.   The position, therefore, of the school book company, under its contract with the State, is that of a private corporation engaged in a private business for private gain.   In *Commonwealth* v. *Bacon*, 13 Bush, 210 (26 Am. Rep. 189), the court lays down the law upon this subject as I understand it to be:  "It is the duty of government to establish and maintain highways.   Ferries are parts of highways, and the government may perform its duty in establishing and maintaining them through the agency of private individuals or corporations, and such agencies are representatives of government, and perform for it a part of its functions.   And in consideration of the service thus performed for the public, the government may prohibit altogether persons from keeping ferries and competing with those it has licensed.   The establishment of public highways being a function of government, no person has a right to establish such a highway without the consent of government; and hence in prohibiting unlicensed persons from keeping a ferry the government does not invade the right of even those who own the soil on both sides of the stream.   The owner of the soil may, unless his land be regularly condemned for the purpose, prohibit any other person from using it as a landing for a ferry.   This he may do, because he is the owner of the soil.   So the government, being charged with the duty of establishing and maintaining ferries, has the exclusive right to establish them, and may prohibit any one it chooses from doing so, because the establishment of a ferry without the consent of government is an invasion of its right, just as the use of the soil for a ferry landing, without the consent of the owner, would be an invasion of his right of property. * * The Bourbon County Agricultural Society is a strictly private corporation.   It owes no legal duty to the public.   It may hold fairs or not

as its managers may decide, and is as free from the interference or control of government as a private individual, and can not, therefore, enjoy any privileges which may not be enjoyed by an individual. The effect of the act then is to restrict the right of one person to use and enjoy his property in a particular manner that another may use his in that manner to greater profit than he could if each was left free to use his own as he pleased. In this country, where the right of the citizen to acquire, hold, and enjoy property is guaranteed by the fundamental law, it would seem that the statement of the proposition is enough to refute it."

It was not, and is not, necessary for any publisher or dealer in school books to obtain a grant or license from the State to do business within the State. Any school book publisher or dealer in school books, may carry on his business in Indiana, the same as may the manufacturer of furniture, cotton or woolen goods, paper, or any other article or commodity.

The exclusive privilege granted to the Indiana School Book Company restricts other school book publishers and dealers in the use and enjoyment of their property in a particular manner; that is to say, they are deprived of the privilege of dealing with the patrons of the schools, and furnishing them school books for the use of their children in the schools; hence the school book company is enabled to enjoy its property to a greater profit, than it could, except for the monopoly which has been granted to it. But I claim that it is plain to be understood from the opinion of the learned judge in *New Orleans Gas Co.* v. *Louisiana Light Co., supra,* that had there been at the time the grant was made such a constitutional provision as we have in our Constitution, in the Louisiana Constitution, the law creating the grant would have been held unconstitutional, and refer to what is said in the opinion, beginning on page 672 of the volume, and I make the same claim for the case of *Louisville Gas Co.* v. *Citizens Gas Co., supra.* In that case the grant was upheld

because the Kentucky Bill of Rights prohibited the granting of exclusive privileges except in consideration of public services, and the court held that the services to be performed in consideration of the grant were public services.

But our Constitution makes no exception ; the provision is a sweeping one : "*The General Assembly shall not grant to any citizen, or class of citizens, privileges or immunities which, upon the same terms, shall not equally belong to all citizens.*" Art. 1, sec. 23.    It is impossible for any other citizen under the law in question for five years, upon any terms, and especially upon the same terms, to furnish text-books to the patrons of the schools for use therein, even if he had for sale the same series of publications.

Suppose that any citizen, or class of citizens, were to offer to enter into a contract with the State upon the same terms as provided in the contract with the Indiana School Book Company, and that his or their books be placed in the hands of the county superintendents or trustees for sale, could the State enter into any such contract or grant the same privileges under this law?    Certainly not.    See *Citizens, etc., Co.* v. *Town of Elwood,* 114 Ind. 332 ; *Soon Hing* v. *Crowley,* 113 U. S. 703 ; *Dent* v. *West Virginia,* 129 U. S. 114 ; *Minneapolis, etc., R. W. Co.* v. *Beckwith,* 129 U. S. 26.

But to return to the contract once more.    I insist that if the law were unobjectionable on constitutional grounds, then under its provisions no valid or binding contract could be made, and hence none has been made.

It is common law that without mutuality between the parties there can be no contract.    There must be obligations on both sides or there is no enforceable contract.    This is so well understood that I do not feel called upon to cite authorities.

Now the contract in question is one to furnish school books, not to the State, but to the patrons of the schools.    The contract, as we have already said, and which will not be controverted, is with the State, and not with the patrons.    The

patrons are under no legal obligations to buy the books; they may be compelled to do so or keep their children out of the public schools, but that is a question of parental duty, and not a legal obligation.

The law expressly stipulates for the State that it assumes no legal liability; then we inquire where is the legal obligation on the side of the State, and in what does the mutuality of the contract consist? There is no legal obligation to the school book company from any one.

But it may be said that the school book company obtains the privilege of putting its books on sale to the patrons of the schools to the exclusion of any other person, and the services of the county superintendents and trustees to sell if any one wishes to buy, it is left, after all, discretionary with the State whether it will comply with its part of the engagement, and if it does not, it is expressly provided that it is not liable for such failure. In the first place, under the law, the school book company was required to enter into bond that if awarded the contract it would enter into a satisfactory contract, but the law does not provide that a bond shall be given for the performance of the contract. An action for its default in performing the conditions of the contract must be brought on the contract against the school book company. We inquire, who is damaged by the default, and what the measure of damages? The State is not damaged, for it purchased no books from the company, and expressly stipulated against liability to the company. The patrons of the schools are not damaged, for the school book company had no contract with them, and they are under no obligations to purchase its books. And if it were possible to find one to whom the book company is bound to respond in case of its default in the performance of the contract, I imagine that it would be a little troublesome to ascertain the measure of damages.

I am aware that there is a class of contracts where a valid contract may be entered into by one of the parties for the

benefit of a third person, but the contract under considera-
tion does not belong to this class.    Here no obligation is en-
tered into to perform any particular act or duty for the benefit
of any third person.    But I further claim, that if it is con-
ceded that the contract is valid and enforceable, the rule
*cum onere* does not apply to county superintendents and trus-
tees in performing the duties required of them by the law in
question.    Why do I make this assertion?    For the reason
that the duties which the law throws upon the county super-
intendents and the trustees are not public duties.    The law
makes them merely the agents of the school book company
to dispose of its wares.    As we have already said, the books
are shipped to these officers direct from the contractor, and
when sold the money is returned directly to it; the property
belongs to the contractor until disposed of to the patrons of
the schools.    With the books and the business transaction,
which places them on the market, and finally returns the
proceeds to the owner, neither the State nor the public has
anything to do.

It is an anomaly to say that while engaged in transacting
the business of a private corporation solely for its private
gain, the trustees and county superintendents are serv-
ing the people.    They are the simple agents of the private
corporation, and it is begging the question to assume that
they are performing the duties of public officers.

This brings me to a consideration of the question of the
right of the people in the several subdivisions of the State,
to manage the local details of their schools, as they have a
right to do in other local affairs.

Most certainly the public schools in which a majority of
the children and youth of the State must begin and finish
their education, is not of all local affairs the one of least im-
portance.

When the territory now comprising our State was given a
territorial government, and from that time down to the
present, township and county subdivisions have existed.

And from the year 1824 until the year 1852, the congressional townships had a corporate existence for school purposes; and from the year 1852 to the present, the civil townships of the State have been incorporated as school townships. And during all this time the people of the school townships, whether congressional or civil townships, have controlled the local details of their common schools; and this included the books which should be used in the schools as well as other matters, and never until the law now under consideration has the Legislature assumed to interfere with these local privileges.

The act of 1877, Acts of 1877, p. 122, organized a county board of education, with power to select and adopt the text-books that should be used in the schools of the county. This board was composed of the county superintendent, the trustees of the different townships, and the chairman of the board of trustees of each town and city in the county. In this board the people of every township, through their trustee, had voice, and after the books were adopted any person or persons had a perfect right to go into the county and sell to the patrons of the schools any of the books adopted. And the patrons of the schools might purchase the books from whomsoever they could, for cash, on time, or in any other manner.

In my judgment the act in question deprives the people of the school townships of the State of an important local privilege or right, and on that ground ought not to be upheld. But as this question has so recently and thoroughly been gone over by this court, I do not desire to do more than call attention to what had been decided. In *State, ex rel. Jameson,* v. *Denny,* 118 Ind. 32, on page 398 this Court, by COFFEY, J., said : " It is, therefore, perfectly apparent from the Constitution itself that it was framed with reference to then existing local governments of counties, towns, townships and cities. Did the people, then, in the adoption of the Constitution, surrender the right to local self-government which they at

that time possessed? Judge COOLEY, in the case above cited (*People* v. *Hurlbut*, 22 Mich. 44), said : ' The State may mould local institutions according to its views of policy or expediency ; but local government is a matter of absolute right; and the State can not take it away.' "

It is true that section 1, article 8 of the State Constitution, *supra*, made it the duty of the Legislature to create a general and uniform system of common schools, but it never was contemplated by the framers of the Constitution, and no such construction can reasonably be placed upon the said section, that the Legislature could or would assume to control the local affairs and details of the schools. The creation of a general system is one thing, and the control of such matters as pertain to that general system, and which are purely local to the people of the school townships, is another and very different thing. Applying the principle as enunciated by Judge COOLEY in the quotation above, the Legislature may mould the system but the local government of the schools exists as an absolute right.

The State may declare how the schools shall be governed, teachers elected, and the branches to be taught therein, but the local control and management of the schools must be left with the people of the districts and townships or their local representatives. What would be thought of a law enacted by the Legislature appointing a State board of commissioners to take charge of the schools in all their details? See the individual opinion in the case last above cited ; *State, ex rel. Holt,* v. *Denny,* 118 Ind. 449, and *City of Evansville* v. *State, ex rel.,* 118 Ind. 426. In *Robinson* v. *Schenck,* 102 Ind. 307, the court said : "It is possible, and only possible, to build up an efficient system by leaving *local* school matters, under proper general laws, to the *people* of the different *localities.* The Legislature have clearly realized this fact, and the law challenged, is an expression of their judgment and that of the people, for it has stood unquestioned for more than eighteen years. We do not affirm that this long acqui-

escence in the law establishes its constitutionality; but we do affirm that it supplies a strong reason in support of our proposition *that the only way in which a great and efficient common school system can be successfully maintained is to entrust to the people of the different localities, by general laws, the government of local school affairs.* * * (The italics are my own). The provision that the Legislature shall provide, by law, for a general and uniform system of common schools does not mean that the Legislature must directly, and by a statute, levy all taxes for each locality, nor that they shall prescribe rules for every school district in the State. * * Where the *right of local government of schools is conferred upon all the school subdivisions* upon the same terms, there is nothing special in the statute, nor is there any break in the line of uniformity. * * It would be absolutely impossible for the Legislature to do more than provide by law for a general and uniform system of common schools, for they could not prescribe the details for the government of each school district in the State; they could not devise a scheme that would meet the wants and necessities of each district, *for this would require them to determine the size of the schoolhouses, the character of the appliances and furniture, the quantity of fuel that should be consumed,* the number of teachers that should be employed, and, indeed, to make provision for the purchase of the smallest things needed for use in the schools, down to the chalk used in the blackboard exercises. The people never meant that the Legislature should undertake to do such an impracticable thing; all they meant was that the system should be general and uniform in the sense that its privileges and benefits should be extended upon the same terms and conditions to all the school districts of the State, and their meaning is well explained in their Constitution. When the Legislature, by a general law, left the *local school government,* upon the same terms and conditions, to all the school districts of the State of like character and condition, they did provide by law for a gen-

eral and uniform system, and so have not disobeyed the command of the people."

This case clearly recognizes the right of local self-government in the control and management of the public schools, and agrees with what I have said already as to what is to be understood as a general school system under the Constitution, and is in line with the unbroken practical construction of the people of the State from the organization of the State government. But, I inquire, if the present law can be upheld, why may not the Legislature provide by law that all school-houses which the districts might be called upon to build for the following period of five years, or more, should be let through the State board of education to the lowest and best bidder, and in the same way all chalk for blackboard exercises furnished to the patrons of the schools; and the school trustees required to superintend the building of the school-houses and the distribution of the chalk among the patrons for the benefit of the contractors? This would have the effect to make the school system more general and uniform.

In *City of Evansville* v. *State, ex rel., supra*, I said, speaking for myself, and not for the Court, that practical construction was of very little consequence when what had been done was in violation of a plain constitutional provision, and I am of that opinion still.

But local control of the common schools by the people of the townships is in violation of no provision of the Constitution, but in harmony with the spirit and letter of that instrument.

From the year 1824 to the passage of the act of 1889, the people of the districts and school townships have had unbroken control of their local school affairs, including the adoption and purchase of text-books without any claim by the Legislature that it had the power to deprive them of any of these privileges. In the individual opinion, to which we have referred, it is said: " Continued and uniform ex-

position, broken by this act for the first time in the whole history of our State, supports the views of the majority of the court upon the question of the right of the citizens of a *political corporation*, such as a county, township or city, to choose their own local officers. The essential and abiding principle of local self-government supports it. The rule that the people, whose property is liable for municipal debts, should choose those to whom they will entrust the management of their local affairs yields it support. The rule that the Constitution recognizes the principle that the people of a locality can govern themselves honestly and intelligently, without the direct guardianship of the persons representing the State at large, gives it support of no uncertain character." *State, ex rel. Jameson,* v. *Denny, supra.*

With what force the foregoing language comes to the law in question, whereby the Legislature has assumed to appoint a board of commissioners with power not only to say to the people the particular series of text-books which their children shall carry to school, but from whom they shall purchase them, the price to be paid, and the manner of payment. The case of *Hovey* v. *State, ex rel.,* 119 Ind. 386, by a majority of the Court, was affirmed solely on the ground of practical construction in the appointment of trustees for the benevolent institutions, and yet there had been no such uniformity nor so long continued, as has been enjoyed by the people of the local school subdivisions in the local management of their schools, including the adoption and purchase of their text-books.

My judgment is, that the law is in violation of the Constitution, and that it is invalid for other reasons which I have stated.

For the reasons given, I dissent from the conclusion reached by a majority of the court.

Filed March 13, 1890.